# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-4042
No. 07-1127

_____

| | | |
|---|---|---|
| Todd Sturgill, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | Appeals from the United States |
| United Parcel Service, Inc., | * | District Court for the |
| | * | Western District of Arkansas. |
| Defendant - Appellant. | * | |
| ------------------------------------------------- | * | |
| National Council of the Churches of | * | |
| Christ in the USA, et al., | * | |
| | * | |
| | * | |
| Amici on Behalf of Appellee. | * | |

_____

Submitted: September 27, 2007
Filed: January 15, 2008

_____

Before LOKEN, Chief Judge, WOLLMAN and RILEY, Circuit Judges.

_____

LOKEN, Chief Judge.

Todd Sturgill was a full-time package car driver for United Parcel Service (UPS) at its Center in Springdale, Arkansas. UPS terminated Sturgill when he refused to complete his route on December 17, 2004, because working past sundown on a Friday would violate his beliefs as a member of the Seventh Day Adventist Church. Sturgill commenced this action, claiming that UPS discriminated against him on

account of his religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). After a lengthy trial, the jury found that UPS violated Title VII by failing to reasonably accommodate Sturgill's religious observance or practice. See 42 U.S.C. § 2000e(j). The jury awarded Sturgill $103,722.25 in compensatory and $207,444.50 in punitive damages. The district court denied UPS's motion for judgment as a matter of law (JAML) and awarded Sturgill reinstatement, front pay to the date of reinstatement, an injunction requiring UPS "to accommodate [his] religious observation of the Sabbath in the future," and $134,838.37 in attorneys' fees and costs. UPS appeals, raising numerous issues. We conclude that the jury was improperly instructed but the errors did not adversely affect its verdict. Accordingly, we affirm the award of compensatory damages, reinstatement, front pay, attorneys' fees, and costs. We reverse the award of punitive damages and the grant of overly-broad injunctive relief.

## I. Background

We summarize the evidence at trial in the light most favorable to Sturgill. At the Springdale Center, UPS pre-loaded drivers' vehicles with packages each weekday morning. A driver's shift normally ended when all pre-loaded packages were delivered. Thus, the end of a driver's work day depended on variables such as the number of packages to be delivered, how many packages needed to be picked up, and road conditions. UPS's peak season extended from Thanksgiving to Christmas. Drivers were often required to work long days during peak season, and their options for discretionary time off were limited. Perquisites such as vacations and bidding privileges depended on a driver's seniority under the collective bargaining agreement (CBA) between UPS and the International Brotherhood of Teamsters.

In May 2004 Sturgill joined the Seventh Day Adventist Church, which forbids working between sundown Friday and sundown Saturday. Realizing that his new religion might interfere with work requirements later in the year, when the sun sets

earlier in the day, Sturgill asked UPS to exempt him from work after sundown on Fridays. He suggested as possible accommodations starting early on Fridays, working Sundays through Thursdays, working longer shifts on Mondays through Thursdays and shorter shifts on Fridays, using vacation time to cover a shorter Friday workday, relief from making next-day air deliveries on Fridays, or no lunch breaks on Fridays. Consistent with established UPS procedures, the Springdale Center's manager, Scotty Patton, forwarded Sturgill's Request for Religious Accommodation to UPS's District Human Resources Manager.

Sturgill's Request was reviewed by district and regional Labor Relations and Human Resources managers. UPS's experienced District Labor Relations Manager, Walter Dickson, testified that UPS denied the Request because Sturgill's suggested year-round accommodations were inconsistent either with UPS operations or with the CBA. Dickson testified that he explored other options with the union's business agent, and they agreed that Sturgill could eliminate the religious conflict by transferring to a UPS "combination job" that did not require work between sundown Friday and sundown Saturday. However, no such jobs were then available at Springdale, and any future combination job would be filled on the basis of seniority. UPS denied the Request in writing, cryptically explaining that the requested accommodations would have a "substantial impact [on] our operation" but also noting the union's position that Sturgill should be offered the chance to bid on other work such as a combination job as it became available. Sturgill acknowledged knowing the union's position and testified that he planned to bid on an appropriate combination job in the spring of 2005. Apparently, he would have been awarded that job based on seniority had he not been fired after the December 17, 2004, incident.

Though UPS denied Sturgill's Request for accommodation, he never had to work after sundown on any Friday before December 17. As the days shortened, when a heavy load threatened to extend Sturgill's Friday shift past sundown, his immediate supervisor, Mike Hadaway, "split" his load, moving packages to other drivers to

-3-

ensure that Sturgill could finish before sundown. Hadaway testified that this type of informal relief was not guaranteed but, whenever possible, he made splits for many drivers for a variety of reasons, for example, to attend a Little League game. The CBA prohibited severely unbalanced workloads, and UPS required full-time drivers to work a full day. Thus, when Sturgill was afforded a split that caused him to work less than an eight-hour "plan day" on November 12, a divisional manager told Sturgill he would be terminated if he failed to complete his deliveries again. However, Sturgill continued to receive splits on Fridays after this November 12 incident.

By mid-afternoon on Friday, December 17, Sturgill realized that he would not be able to complete his route before sundown. He called Hadaway and asked for a split. Hadaway could not find a driver to assist and told Sturgill to call Center manager Patton. Patton warned Sturgill he would be fired if he did not deliver all of his packages that day. Sturgill delivered packages until sundown, then returned about thirty-five packages to the Springdale Center and left work. A UPS supervisor completed the deliveries after dark. Terminated for abandoning his job, Sturgill filed a grievance, claiming religious discrimination. A grievance panel of management and union members denied the grievance. This lawsuit followed.

Sturgill's primary theory at trial was that UPS, with minimal cost and without violating the CBA, could have reasonably accommodated his religious practice on December 17 by splitting his load with other drivers. Sturgill presented evidence that UPS routinely balanced loads when the vehicles were pre-loaded in the morning, and that other Springdale drivers with less seniority worked fewer hours and were given many fewer packages to deliver on December 17. There was also substantial trial testimony concerning whether Springdale Center managers had available during the peak season one or more other procedures that, with sufficient advance notice and planning, would have avoided Sturgill's religious conflict on December 17 without violating the CBA or causing undue hardship to UPS's operations. UPS and union witnesses testified that all of these potential accommodations -- paid leave, vacation

time, "personal holidays" or "option days," and requests for relief from overtime -- would have violated the CBA or resulted in extensive overtime wages or in fundamental changes to UPS's business model. But the testimony by local Springdale drivers and managers was confused and inconsistent on these issues.

UPS also presented evidence tending to show that routinely granting Sturgill Friday splits might require new drivers or more overtime, that drivers covering for Sturgill might be less efficient delivering his route, and that allowing Sturgill a set end time might result in other drivers filing grievances for being required to work excessive overtime. Sturgill countered with evidence tending to show that, given the enormous volume handled by Springdale drivers during peak season, relieving him of overtime work on Fridays would only negligibly increase other drivers' workloads and might reduce UPS's costs because the drivers that regularly covered Sturgill's route had less seniority and a lower hourly wage rate.

The case was submitted on two alternative theories of Title VII liability, that Sturgill was terminated because of his religion, and that the termination was caused by a failure to reasonably accommodate his religious beliefs. The jury found for UPS on the first claim, but it found for Sturgill on the accommodation claim. We agree with the district court there was ample evidence permitting a reasonable jury to find that UPS could have accommodated Sturgill's religious practice on December 17, 2004, without violating the CBA and without undue hardship to UPS operations. Therefore, JAML was properly denied. See Fed. R. Civ. P. 50(a)(1).

**II. The Jury Instruction Issue**

Title VII declares that it is an unlawful employment practice for an employer "to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). The statute defines "religion" as including -

all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j). Sturgill alleges that UPS violated its duty to reasonably accommodate his religious belief that he must abstain from work between sundown Friday and sundown Saturday. It is undisputed that Sturgill timely notified UPS of a conflict between a sincerely held religious belief and his work requirements. See Jones v. TEK Indus., Inc., 319 F.3d 355, 359 (8th Cir. 2003).

Overruling UPS's timely objection, the district court instructed the jury that "an accommodation is reasonable if it *eliminates* the conflict between Plaintiff's religious beliefs and Defendant's work requirements and reasonably permits Plaintiff to continue to be employed by Defendant" (emphasis added), but that Sturgill need not receive the accommodation of his choice. On appeal, UPS argues that this instruction was error requiring a new trial because, as a matter of law, an employer's accommodation is reasonable if it provides a religion-neutral way for the employee to *minimize* a religious conflict. Sturgill and supporting amici counter that the court committed no instructional error because, to be reasonable as a matter of law, an employer's accommodation *must* eliminate the conflict and "fully satisfy the religious convictions of an employee." We reject both contentions. What is reasonable depends on the totality of the circumstances and therefore might, or might not, require elimination of a particular, fact-specific conflict.

The word "minimize" urged by UPS entered this Title VII universe in the Supreme Court's first opinion resolving a religious accommodation issue, Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 78 (1977):

[A collective bargaining agreement's] seniority system represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off.

The Court in Hardison established important principles: that the Title VII duty to reasonably accommodate religious beliefs does not require an employer "to take steps inconsistent with the otherwise valid [collective bargaining] agreement," nor does it require the employer to discriminate against other employees by depriving them of collectively bargained seniority rights in order to accommodate plaintiff's observance of the Saturday Sabbath. Id. at 79, 81. In this case, without objection, the district court properly included these principles in its instructions to the jury. But Hardison did not hold, more broadly, that an employer's duty to reasonably accommodate *never* requires additional actions beyond, but not inconsistent with, its contractual obligations under a collective bargaining agreement. Indeed, the Court in Hardison discussed such additional actions but concluded on the facts of that case that they would have imposed an undue hardship. Id. at 84-85.[1]

The word "eliminate" that Sturgill urges and the district court adopted appeared in the Supreme Court's only other opinion resolving a religious accommodation issue, Ansonia Board of Education v. Philbrook, 479 U.S. 60 (1986). The Court concluded that "requiring respondent to take unpaid leave for holy day observance" would be a reasonable accommodation if applied in a religion-neutral manner because "[t]he

---

[1]UPS correctly notes that we used the word "minimizing" in Mann v. Frank, 7 F.3d 1365, 1369 (8th Cir. 1993), and in Cook v. Chrysler Corp., 981 F.2d 336, 339 (8th Cir. 1992), cert. denied, 508 U.S. 973 (1993). But in Mann the plaintiff initially turned down a voluntary program that would have eliminated the conflict, and in Cook the district court found that additional accommodations outside the collective bargaining agreement caused undue hardship. Thus, neither decision supports UPS's assertion that a collective bargaining agreement that "minimizes" a religious conflict is always a reasonable accommodation as a matter of law.

provision of unpaid leave eliminates the conflict between employment requirements and religious practices." Id. at 70. Again, the Court established an important principle: that an accommodation is reasonable as a matter of law if it eliminates a religious conflict; therefore, the employee has no right to insist upon a different accommodation that he prefers.[2] But the Court in Ansonia did not hold, indeed did not suggest, that an accommodation, to be reasonable as a matter of law, *must* eliminate any religious conflict.

The Supreme Court explained in Ansonia that a rule mandating that employees be given their preferred accommodations would be inconsistent with the intended purpose of Title VII's reasonable accommodation provision, to foster "bilateral cooperation" in resolving an employee's religion-work conflict. 479 U.S. at 69; see Chrysler Corp. v. Mann, 561 F.2d 1282, 1285-86 (8th Cir. 1977). It would likewise be inconsistent with this purpose to hold that an accommodation, to be reasonable, *must* wholly eliminate the conflict between work and religious requirements in all situations. Read in this context, it is clear that the Court's reference to "eliminat[ing] the conflict" was not intended to pronounce a rule that *all* employees -- absent undue hardship -- must receive accommodations that eliminate any conflict between religion and work. Our reading of Ansonia is confirmed by the dissenting opinion, which argued that the employer should remain under an obligation to consider the employee's reasonable proposals "if the accommodation offered by the employer does not completely resolve the employee's conflict." 479 U.S. at 72-73 (Marshall, J., dissenting).

Many prior cases are inconsistent with the contention that, absent undue hardship, an employer has a Title VII duty to eliminate every employee's religious

---

[2]In Ansonia, the Court remanded for factual findings as to how the school board's unpaid leave policy had been applied because "unpaid leave is not a reasonable accommodation when paid leave is provided for all purposes *except* religious ones." 479 U.S. at 71 (emphasis in original).

conflict. In Wilson v. U.S. West Communications, 58 F.3d 1337, 1341 (8th Cir. 1995), we rejected the claim that the employer was unreasonable as a matter of law in requiring an employee to cover up a graphic, religiously-motivated anti-abortion button at work. Without discussing undue hardship, we observed that requiring the employer to instruct co-workers they must tolerate the plaintiff's offensive button "is antithetical to the concept of reasonable accommodation." In Shelton v. University of Medicine & Dentistry of New Jersey, 223 F.3d 220, 226 (3d Cir. 2000), the court affirmed dismissal of the claim of a nurse who objected to participating in any medical procedure that would terminate a pregnancy, despite the nurse's contention that the accommodation offered -- transfer to a newborn intensive care unit -- might not have eliminated the religious conflict. And in Bruff v. North Mississippi Health Services, Inc., 244 F.3d 495, 501 (5th Cir.), cert. denied, 534 U.S. 952 (2001), when a counselor refused to offer advice about homosexual and non-marital sexual relationships because these relationships offended her religion, the court concluded that it was a reasonable accommodation as a matter of law when the employer offered to help the employee apply for other positions "where the likelihood of encountering further conflicts with her religious beliefs would be *reduced*" (emphasis added). See also EEOC v. Universal Mfg. Corp., 914 F.2d 71, 73 (5th Cir. 1990) ("The Supreme Court has never held that the question of 'reasonable accommodation' focuses upon the number of conflicts or *even upon the proportion of a single conflict eliminated by the employer's offer of accommodation*.") (emphasis added).

Similar analysis has been applied to many claims that an employer failed to reasonably accommodate an employee's religious desire not to work on the Sabbath. In Brener v. Diagnostic Center Hospital, 671 F.2d 141, 145 (5th Cir. 1982), a decision cited favorably in Ansonia, 479 U.S. at 69, the court affirmed judgment for an employer, concluding it was reasonable to require the employee to arrange swaps with other employees to avoid working on the Sabbath and to fire the employee for refusing to work after failing to arrange a swap. In Wren v. T.I.M.E.-D.C., Inc., 595 F.2d 441, 444-45 (8th Cir. 1979), a truck driver joined the Worldwide Church of God

-9-

but continued to work some Sabbath days. When the employer's demands increased, the driver insisted he would only work on the Sabbath in an emergency, "resorted to using his ingenuity to avoid working on the Sabbath," and was terminated after refusing to accept work many Sabbath days. We affirmed the district court's judgment in favor of the employer.

Likewise, in Cook, 981 F.2d at 337-39, a Seventh Day Adventist ended a lay-off by accepting a new position. Lacking seniority, he was placed on a shift requiring Friday night work, denied a shift change, and eventually terminated for multiple unexcused absences. We affirmed a judgment in favor of the employer and the union, concluding that the seniority system for bidding on more favorable shifts, combined with a first-come-first-serve procedure for requesting Fridays off in advance, was a significant accommodation and any further accommodation would be either impractical, too costly, or contrary to the collective bargaining agreement. And in Mann, 7 F.3d at 1367-69, we affirmed a judgment rejecting the religious accommodation claim of a Seventh Day Adventist because, while the employer did not completely eliminate the conflict between her work and her religious desire not to work on Friday nights and Saturdays, the employer's seniority system and the voluntary nature of its overtime procedure were significant accommodations that justified suspending the employee when she disobeyed instructions to work a Friday night-Saturday morning shift.

In light of these precedents and the Supreme Court's analysis in Ansonia and Hardison, we decline to follow the few decisions in other circuits declaring that a "reasonable" accommodation must eliminate any religion-work conflict. Cosme v. Henderson, 287 F.3d 152, 159 (2d Cir. 2002), and Wright v.Runyon, 2 F.3d 214, 217 (7th Cir. 1993), cert. denied, 510 U.S. 1121 (1994), affirmed judgments for employers, so the declarations accompanied by a bare citation to Ansonia reflect little

-10-

analysis.[3] In EEOC v. Townley Engineering & Manufacturing Co., 859 F.2d 610, 615 (9th Cir. 1988), cert. denied, 487 U.S. 1077 (1989), the Ninth Circuit simply cited its own pre-Ansonia decisions for this proposition without analyzing the impact of Ansonia. The Sixth Circuit in Smith v. Pyro Mining Co., 827 F.2d 1081, 1085 (6th Cir. 1987), cert. denied, 485 U.S. 989 (1988), likewise relied solely on pre-Ansonia decisions.

For these reasons, we conclude that the district court erred in instructing the jury that a reasonable accommodation must eliminate the religious conflict, an instruction that improperly took that issue from the jury. To be sure, there may be many situations in which the only reasonable accommodation is to eliminate the religious conflict altogether. But in close cases, that is a question for the jury because it turns on fact-intensive issues such as work demands, the strength and nature of the employee's religious conviction, the terms of an applicable CBA, and the contractual rights and workplace attitudes of co-workers. Bilateral cooperation under Title VII requires employers to make serious efforts to accommodate a conflict between work demands and an employee's sincere religious beliefs. But it also requires accommodation by the employee, and a reasonable jury may find in many circumstances that the employee must either compromise a religious observance or practice, or accept a less desirable job or less favorable working conditions.

That brings us to the equally critical question of whether the faulty instruction was reversible error. The elimination issue was potentially important, for the above-

---

[3]Indeed, the Seventh Circuit subsequently rejected a claim by a Baptist police officer that reasonable accommodation required a complete exemption from working at gambling casinos. "Whether or not a paramilitary organization could accommodate task-specific conscientious objection . . . the demand would not be reasonable -- and [Title VII] calls only for reasonable accommodations. . . . Selective objection to some of the employer's goals raises problems on the 'reasonableness' branch as well as the 'undue hardship' branch." Endres v. Ind. State Police, 349 F.3d 922, 925 (7th Cir. 2003), cert. denied, 541 U.S. 989 (2004).

cited cases demonstrate that it may well have been reasonable for UPS's district and regional managers to conclude, with the union's concurrence, (i) that the accommodations proposed by Sturgill were costly or inconsistent with the CBA and therefore (ii) all that could be offered Sturgill was the prospect of bidding on a less desirable, but conflict-eliminating combination job in 2005. But these decision-makers did not consult local Springdale Center managers to determine whether there were additional procedures, formal or informal, that could be employed to help Sturgill avoid Friday work conflicts in the interim. As a result, all Center manager Patton learned was, "Request denied," which he construed as a mandate to give Sturgill no accommodation and to fire him when he could not complete his December 17 assignment before sundown. Supervisor Hadaway informally accommodated Sturgill every Friday before December 17, but this reflected Hadaway's efforts to accommodate diverse driver preferences, not Sturgill's religion. Indeed, Hadaway testified that, if so instructed in advance, he could have accommodated Sturgill on December 17, apparently without violating the CBA.[4] This evidence of a specific, one-time failure to accommodate resulting in the severe sanction of termination justified the jury's verdict, without regard to whether UPS had a broader Title VII duty to completely and permanently eliminate the religious conflict. In these circumstances, we conclude that the instruction error neither misled the jury nor had a probable effect on the verdict. See Bass v. Flying J, Inc., 500 F.3d 736, 739 (8th Cir. 2007) (standard of review).

---

[4]Thus, UPS failed to prove that further accommodation would have caused undue hardship as a matter of law. To meet its burden of proof on this issue, an employer must establish that the hardship is "real rather than speculative . . . merely conceivable, or hypothetical." Undue hardship "cannot be proved by assumptions nor by opinions based on hypothetical facts." Brown v. Polk County, 61 F.3d 650, 655 (8th Cir. 1995) (en banc) (quotation omitted), cert. denied, 516 U.S. 1158 (1996).

## II. Compensatory Damages, Reinstatement, and Injunctive Relief

Relying on our decision in <u>Voeltz v. Arctic Cat, Inc.</u>, 406 F.3d 1047 (8th Cir. 2005), UPS argues that the district court erred in awarding compensatory damages, reinstatement, limited front pay, and injunctive relief because the jury found, in rejecting Sturgill's discriminatory discharge claim, that his religion was not a motivating factor in UPS's discharge decision. The district court rejected this contention, concluding that the jury properly awarded discharge-related damages for UPS's failure to reasonably accommodate Sturgill's religion because, "had defendant accommodated plaintiff's observance of the Sabbath [on December 17], he . . . would not have been terminated for job abandonment." We agree.

The district court properly instructed the jury that intentional religious discrimination and the failure to reasonably accommodate an employee's religion are distinct Title VII claims. <u>See</u> <u>Voeltz</u>, 406 F.3d at 1051; <u>Reed v. Great Lakes Cos.</u>, 330 F.3d 931, 934-35 (7th Cir. 2003). General tort law principles of causation apply in determining the damages and other relief that may be recovered for an intentional[5] violation of an employer's Title VII duty to accommodate an employee's religion. <u>See</u> <u>Shick v. Ill. Dept. of Human Servs.</u>, 307 F.3d 605, 615 (7th Cir. 2002). Thus, the question is whether the injury resulting from Sturgill's termination for not completing his route on December 17 was proximately caused by UPS's failure to accommodate

---

[5]Title VII provides that an employer commits an unfair employment practice if it fails to *reasonably* accommodate an employee's religion, which is a negligence standard of liability. However, an employee-plaintiff is entitled to reinstatement, back pay, other injunctive relief, and monetary damages only if the employer "has intentionally engaged in . . . an unlawful employment practice." 42 U.S.C. § 2000e-5(g), incorporated by reference in 42 U.S.C. § 1981a(a)(1). Here, without objection, the district court failed to instruct the jury that these remedies are limited to intentional violations of what is otherwise a negligence tort. Because prior religious accommodation cases have not discussed the issue, there was no plain error. However, failure to give this limiting instruction in the future will be reversible error.

his sincerely held and properly communicated religious belief.  This precise question was addressed by a district court in this circuit in <u>Vetter v. Farmland Industries, Inc.</u>, 901 F. Supp. 1446, 1459 (N.D. Iowa 1995), <u>rev'd on other grounds</u>, 120 F.3d 749, 751-52 (8th Cir. 1997):

> What is important to the court's conclusion . . . is that Farmland's failure to accommodate occurred before any "insubordination" . . . and, indeed, was the "but for" cause of "insubordination" by Vetter . . . .  To put it another way, if Farmland had reasonably accommodated Vetter's religious beliefs, his asserted "insubordination" would never have occurred. . . .  The court cannot envision a construction of Title VII that permits an employer . . . to be relieved of the burden of damages to the employee for the employer's refusal to accommodate, because the employee subsequently chooses to follow the dictates of the employee's religion rather than those of the employer.

We agree with Judge Bennett's analysis of this issue and accordingly uphold the district court's award of reinstatement with front pay and compensatory damages.[6] However, we vacate the grant of an injunction requiring UPS "to accommodate plaintiff's religious observation of the Sabbath in the future."  This command to obey the law "was overbroad under general equitable principles."  <u>Jake's Ltd. v. City of Coates</u>, 356 F.3d 896, 904 (8th Cir. 2004).  In addition, given the conflicting evidence and the court's instruction errors, it is not at all clear what accommodations will be reasonable in the future.  Such a debatable issue should not be the subject of contempt proceedings.

---

[6]In our view, UPS's reliance on <u>Voeltz</u>, an ADA failure-to-accommodate case, is misplaced because in <u>Voeltz</u> the jury found that the employer would not have recalled the plaintiff had he not been disabled, so his injury was not caused by the employer's failure to accommodate his disability.  406 F.3d at 1049, 51.  Here, by contrast, there was overwhelming evidence that UPS considered Sturgill a good employee and only discharged him because of the December 17 incident.

-14-

### III. Punitive Damages

UPS next argues that the district court erred in denying its post-verdict motion for judgment as a matter of law on Sturgill's claim for punitive damages. We agree.

Punitive damages may be awarded for an intentional Title VII violation if the employer acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C, § 1981a(b)(1). The requisite showing of malice or reckless indifference requires proof that the employer "at least discriminate[d] in the face of a perceived risk that its actions will violate federal law." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999). Thus, punitive damages are inappropriate if the employer was unaware of the federal prohibition, or if the plaintiff's underlying theory of discrimination was novel or poorly recognized, or if the employer reasonably believed that its discrimination satisfied a bona fide occupational defense. Id. at 537. Moreover, even if particular agents exhibited malice or reckless indifference, the employer may avoid vicarious punitive damages liability by showing that it made good faith efforts to comply with Title VII. Id. at 545-46. Given these stringent standards, plaintiffs face a "formidable burden" when seeking punitive damages for employment discrimination. Canny v. Dr. Pepper/ Seven-Up Bottling Grp., Inc., 439 F.3d 894, 903 (8th Cir. 2006) (quotation omitted).

In this case, UPS demonstrated that it followed a nationwide, multi-step protocol for considering employee requests for religious accommodations. No UPS employee was shown to have acted with malice or reckless indifference to Sturgill's accommodation request. The district and regional managers concluded, after consulting a union representative, that Sturgill's suggested accommodations would violate the CBA or disrupt UPS operations. Accordingly, they denied his request and suggested he use his seniority to bid on a combination job when available. The Supreme Court in Hardison recognized that these are bona fide defenses to religious accommodation claims. 432 U.S. at 79-81, 84. At the local level, Center manager Patton helped Sturgill submit his formal Request and then abided by the answer --

Request denied -- while supervisor Hadaway successfully accommodated Sturgill informally until the ill-fated December 17 incident. The jury reasonably found that the lack of communication between the local managers and the Title VII decision-makers resulted in a failure to reasonably accommodate Sturgill's religion on December 17, but this is nothing more than violation of a Title VII negligence standard. The incident was followed by a harsh and precipitous discharge for job abandonment, which looks more like an intentional tort. But given the pressures and significance of the UPS peak season, and the prior warnings to Sturgill, his discharge did not establish either individual or corporate malice or reckless indifference to UPS's Title VII obligations. Compare Webner v. Titan Distrib., Inc., 267 F.3d 828, 837 (8th Cir. 2001) (punitive damages inappropriate when employer acted to protect itself against employee absences). The award of punitive damages is reversed.

## IV. Attorney's Fees and Costs

Over UPS's objection, the district court awarded Sturgill $120,258.74 in attorney's fees and $14,579.63 in costs. See 42 U.S.C. § 2000e-5(k). UPS asserts that the fees must be reduced and certain costs were non-compensable. "We review *de novo* the legal issues related to the award of attorney's fees and costs and review for abuse of discretion the actual award of attorney's fees and costs." Thompson v. Wal-Mart Stores, Inc., 472 F.3d 515, 516 (8th Cir. 2006).

UPS argues that the attorney's fees must be discounted for Sturgill's limited success because the jury rejected his claim of intentional religious discrimination. This contention is without merit. In determining the reasonable attorney's fee to award a Title VII prevailing party, the court should consider whether the plaintiff failed to prevail on claims that are *unrelated* to his successful claims, and whether the plaintiff "achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." Hensley v. Eckerhart, 461 U.S. 424, 434 (1983). Here, Sturgill's accommodation and religious discrimination claims were inextricably related -- they alleged alternative unlawful discharge theories. When the

facts and legal theories overlap in this fashion, and when the prevailing party pursued alternative legal theories in good faith, rejection of one theory "is not a sufficient reason for reducing a fee. The result is what matters." Id. at 435. Nor does our decision that the award of punitive damages must be reversed and the injunction vacated require a reconsideration of the fee award, given the substantial relief that Sturgill received and the amount awarded. See Allen v. Tobacco Superstore, Inc., 475 F.3d 931, 943-44 (8th Cir. 2007).

Finally, UPS argues the district court erred in including attorney travel and private process server expenses in its award of costs because these are not recoverable costs under 28 U.S.C. § 1920. See Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987) (absent statutory authorization, federal court may only award costs enumerated in § 1920). Title VII grants discretion to award the prevailing party "a reasonable attorney's fee . . . as part of the costs." 42 U.S.C. § 2000e-5(k). The district court rejected UPS's contention because other circuits have construed § 2000e-5(k) as allowing the award of "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee paying client." Mota v. Univ. of Tex. Houston Health Sci. Ctr., 261 F.3d 512, 529 (5th Cir. 2001) (quotation omitted); accord LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998). We conclude that this rule is consistent with the Supreme Court's decision in Missouri v. Jenkins, 491 U.S. 274, 285 (1989), as construed in W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 99-100 (1991). UPS does not argue that the expenses in question are not normally charged to fee-paying clients. Accordingly, the district court did not abuse its discretion in awarding these costs.

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded for entry of an appropriate amended judgment.

_____