# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2486
_____

Kirk J. Ludlow

*Plaintiff - Appellee*

v.

BNSF Railway Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: February 10, 2015
Filed: June 4, 2015

_____

Before LOKEN, SMITH, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

Former Claims Representative Kirk Ludlow sued BNSF Railway for wrongful termination in violation of Nebraska public policy and whistleblower retaliation in violation of the Nebraska Fair Employment Practices Act (NFEPA), Neb. Rev. Stat. § 48-1114(3). A jury found BNSF liable on the NFEPA claim and awarded Ludlow

damages. The district court[1] denied BNSF's pre- and post-verdict motions for judgment as a matter of law (JMOL) and granted Ludlow $206,514.13 in attorney's fees and $22,202.16 in nontaxable costs. On appeal, BNSF argues the district court erred in denying JMOL, in instructing the jury, and in determining the amount of attorney's fees and costs. We affirm.

## I. Background

In reviewing the denial of JMOL, because sufficiency of the evidence in support of the jury's verdict is at issue, we must view all facts and resolve any conflicts in favor of Ludlow, giving him the benefit of all reasonable inferences. We will not reweigh the evidence or consider the credibility of witnesses, and we will affirm "if a reasonable jury could differ as to the conclusions that could be drawn." Lawrence v. CNF Transp., Inc., 340 F.3d 486, 491 (8th Cir. 2003); see Reed v. Malone's Mech., Inc., 765 F.3d 900, 913 (8th Cir. 2014). The fact assertions in BNSF's briefs on appeal repeatedly ignore these well-established appellate principles.

Ludlow became a Claims Representative in BNSF's Law/Claims Department in 2000. Prior to the July 2010 termination, no disciplinary issues were recorded in his employment history transcript. In September 2009, Ludlow discovered his forged signature on documents submitted to the Department of Veterans Affairs (VA) certifying that coworker Larry Fernandes was eligible to receive VA training program benefits. Ludlow reported the forgery to his supervisor, Barry Wunker, opining that Fernandes may have been responsible. Wunker did not investigate the claimed forgery or report it to his superiors, contrary to what Ludlow believed the BNSF code

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

-2-

of conduct required. In April 2010, Ludlow reported the forgery to the BNSF police,[2] notifying Wunker the following day. Wunker expressed displeasure, and at a meeting the next day told Ludlow that his immediate superior, Bill Renney, was angry that Ludlow was shedding negative light on the Claims Department. Wunker expressed concern that the forgery's disclosure could cost him his job.

Following Ludlow's report to BNSF police, Wunker began sending complaints regarding Ludlow's workplace behavior to BNSF Human Resources. Wunker told Renney that Ludlow's forgery claim was motivated by jealousy of Fernandes. Renney relayed this to his superior, Dennis Cannon, and added that Brian Williams, the investigating BNSF police officer, also viewed Ludlow as jealous -- a statement Williams denied at trial. Wunker, Renney, and Cannon then drafted an e-mail ordering Ludlow to "immediately cease and desist" from independently participating in the forgery investigation and ordering him to route all future communications related to the investigation through Renney. Renney later pressured Williams to close the forgery investigation, and wrote the VA explaining that Ludlow's forgery accusation was motivated by dislike of Fernandes. Williams testified that Renney appeared to be looking for a reason to terminate Ludlow.

On May 17, 2010, Ludlow told Wunker and Renney that a VA investigator had called; Ludlow asked their permission to speak with the investigator. He was instructed to comply with the cease-and-desist order and direct future inquiries to Renney. On July 8, Williams notified Wunker, Renney, and Cannon that the VA's Office of Inspector General (OIG) intended to contact Ludlow to discuss the forgery. On July 19, Ludlow or Williams notified Renney that the OIG would meet with Ludlow the next week.

---

[2]Federal law grants railroad police officers broad law enforcement powers to protect the railroad's operations. See 49 U.S.C. § 28101(a).

-3-

On July 13, Ludlow and Mary Adamson, a janitor, were engaged in workplace banter when Ludlow made a karate kick motion towards her, lightly striking Adamson's head and neck when he slipped. Adamson did not report the incident, which she considered accidental, but Fernandes learned of the incident from another employee and reported it to Wunker on July 16. On July 21, after learning of Ludlow's scheduled meeting with OIG, Wunker and Renney drafted an e-mail recommending that Ludlow be terminated due to the kick incident. Renney sent the e-mail to Cannon, who forwarded it to his immediate superior, Richard Lifto. Cannon acknowledged that Wunker and Renney were his sole sources of information regarding Ludlow's workplace behavior. Renney sent Lifto an e-mail describing various incidents of inappropriate workplace behavior by Ludlow that Renney or Wunker had observed. Ludlow testified that Renney's version of the incidents was either false or heavily distorted.

On July 28, Wunker, Renney, Cannon, and Lifto participated in a conference call with Charles Shewmake, BNSF's Vice President and General Counsel. The others told Shewmake that Ludlow had demonstrated a "roundhouse" kick on Adamson and gave Shewmake a report of past incidents similar to the one that Renney had e-mailed Lifto. Shewmake testified that Wunker brought up the forgery investigation during the call and accused Ludlow of "something improper involving the VA." Shewmake testified that he based the decision to terminate Ludlow solely on the information obtained from the participants in the phone call, and claimed that Wunker's comments about the VA forgery investigation were made after Shewmake decided to terminate Ludlow. Ludlow was fired the next day.

Ludlow filed this action in state court in May 2012. BNSF timely removed. After substantial discovery, BNSF moved for summary judgment on the NFEPA-retaliation claim, arguing no protected activity, no "causal connection" between any protected activity and the termination because decision-maker Shewmake was not an unwitting "cat's paw" for unlawful retaliation by Wunker and Renney, and no

-4-

evidence that BNSF's legitimate non-retaliatory reason for discharge was pretextual. The district court[3] denied the motion in a lengthy July 2013 Memorandum and Order. The case was reassigned to Judge Kopf, and an eight-day trial commenced in November 2013. Judge Kopf denied BNSF's written pre-verdict motion for JMOL. See Fed. R. Civ. P. 50(a). After the jury returned its verdict for Ludlow on the NFEPA-retaliation claim, the district court denied BNSF's Rule 50(b) renewed motion for JMOL, entered judgment on the NFEPA claim, and awarded Ludlow attorney's fees and nontaxable costs. This appeal followed.

## II. Sufficiency of the Evidence

On appeal, BNSF argues the district court erred in denying JMOL because Ludlow failed to present sufficient evidence for the jury to find two essential elements of an NFEPA-retaliation claim: (A) that Ludlow was engaging in protected activity when he suffered an adverse employment decision (termination); and (B) that there was a causal link between the protected activity and the adverse decision.

**(A)** NFEPA prohibits retaliation against an employee because he "has opposed any practice or refused to carry out any action [by the employer that is] unlawful under the laws of the United States or this state." Neb. Rev. Stat. § 48-1114(3). Prior to trial, BNSF moved for summary judgment on this issue, arguing that instructing employee Ludlow not to assist a VA forgery investigation that did not involve BNSF assets was not an unlawful action under Nebraska or federal law. In denying this motion, Judge Urbom explained:

> In summary, Ludlow has produced evidence that BNSF used its power over him to attempt to dissuade him from assisting with a federal

---

[3]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

forgery investigation; that BNSF's conduct is of the type that is prohibited under 18 U.S.C. § 1512 and Revised Statutes of Nebraska § 28-919; and that Ludlow opposed BNSF's conduct by seeking his supervisor's permission to speak with investigators, and, after being told to continue to refer all investigators to Renney, scheduling an interview with Investigator Jourdan despite the "cease and desist" orders. The evidence is sufficient to establish the first element of a prima facie case under § 48-1114(3).

In its written Rule 50(a) motion, BNSF again thoroughly briefed this no-protected-activity contention. Judge Kopf again denied it. In submitting this issue to the jury, Judge Kopf instructed, without objection:

When considering both of [Ludlow's] claims, you are instructed that an individual employee has no right to communicate with criminal investigators on behalf of his employer unless authorized by his employer to do so. . . . On the other hand, an individual employee has a right to communicate with criminal investigators on behalf of himself alone. Thus, a direction from BNSF supervisors that Kirk Ludlow was not to communicate with criminal investigators on behalf of himself individually . . . would have been unlawful. It is for you to decide the nature and extent of the instructions, if any, given to Kirk Ludlow by BNSF supervisors about communications with criminal investigators.

Following the adverse jury verdict, BNSF filed a Rule 50(b) Renewed Motion for Judgment as a Matter of Law. The Motion argued the causation element of a NFEPA claim at length but did not address the no-protected-activity issue.

On appeal, BNSF argues it was entitled to JMOL because requesting Ludlow "to cease and desist from pursuing his allegations of forgery . . . as an employee of BNSF . . . does not constitute an unlawful practice under the NFEPA as a matter of law." Ludlow argues that BNSF failed to preserve this issue because, while raised

in BNSF's pre-verdict JMOL motions, it was not addressed in BNSF's post-verdict Rule 50(b) motion.

Without question, when the verdict loser fails to file a Rule 50(b) motion renewing its pre-verdict Rule 50(a) JMOL motion, "there [is] no basis for review of [the party's] sufficiency of the evidence challenge in the Court of Appeals." EEOC v. Sw. Bell Tel., L.P., 550 F.3d 704, 708 (8th Cir. 2008), quoting Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 407 (2006). In Southwestern Bell, we held that the rule in Unitherm precludes review of all "sufficiency of the evidence challenges" relating to a claim or affirmative defense. "[F]iling a Rule 50(b) motion is a prerequisite for appealing the denial of a Rule 50(a) motion because it allows the district court, which has 'first-hand knowledge of witnesses, testimony, and issues,' an opportunity after the verdict to review the legal sufficiency of the evidence." Id. at 710, quoting Unitherm, 546 U.S. at 401 n.3.

In Unitherm and Southwestern Bell, *no* Rule 50(b) renewed JMOL motion had been filed. Here, on the other hand, BNSF filed a Rule 50(b) "renewed" motion, but it did not explicitly address this issue. But in Moore v. American Family Mutual Insurance Co., 576 F.3d 781, 785 (8th Cir. 2009), and in Nutrisoya Food, Inc. v. Sunrich, LLC, 641 F.3d 282, 290 (8th Cir. 2011), we extended our Southwestern Bell ruling to sufficiency of the evidence challenges that are based on *issues* that were not raised in an appellant's renewed Rule 50(b) motion.

The text of Rule 50(b) does not call for a categorical rule in this situation, and in prior cases we have noted that "technical precision is not necessary in stating grounds for the [Rule 50(b)] motion so long as the trial court is aware of the movant's position." Rockport Pharm., Inc. v. Digital Simplistics, Inc., 53 F.3d 195, 197 (8th Cir. 1995) (quotation omitted). There may be cases where an issue not expressly addressed in a Rule 50(b) renewed motion is appropriate for appellate review because it was "inexplicably intertwined" with an issue presented to and decided by the

district court.  See id. at 198 .  But here, BNSF does not simply attack the legal basis for Judge Urbom's summary judgment ruling, which Judge Kopf upheld in denying BNSF's Rule 50(a) motion.  Rather, BNSF urges us to conclude that the evidence at trial failed to establish the *factual* predicate for Judge Urbom's prior analysis, as reflected in Judge Kopf's instructions.  The trial evidence established, BNSF argues, that Ludlow's supervisors told him to cease and desist from pursuing his allegations of forgery *as a BNSF employee*, without the unlawful intent required to show violations of the statutes cited by Judge Urbom.  That is a fact-based sufficiency of the evidence challenge for which an appellate court needs the district court's post-verdict analysis.  Therefore, we agree with Ludlow that this issue was not preserved for appellate review.

Moreover, even if preserved for appellate review, we conclude that the no-protected-activity contention is without merit on this trial record.  We agree with Judge Urbom's interpretation of the Nebraska whistleblower statute.  See Wolfe v. Becton Dickinson & Co., 662 N.W.2d 599, 604 (Neb. 2003).  Judge Kopf's instruction was consistent with Judge Urbom's analysis and fairly submitted BNSF's agency defense to the jury.  The evidence, viewed most favorably to the verdict, was sufficient to satisfy this element of Ludlow's NFEPA retaliation claim as clarified by the instruction.

**(B)**  At trial, the district court instructed the jury -- without objection -- that Ludlow must prove that BNSF attempted to cause him not to talk to criminal investigators, and that his refusal to comply was a "motivating factor" in BNSF's decision to terminate.  On appeal, BNSF argues that the Supreme Court of Nebraska would instead adopt the but-for "determining factor" causation standard adopted by the Supreme Court for federal Title VII retaliation claims, see Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013); and that the evidence was insufficient to show that unlawful retaliation was the but-for cause of Shewmake's decision to terminate Ludlow because of the karate-kick incident.

Ludlow argues that BNSF failed to preserve this sufficiency issue because its pre-verdict Rule 50(a) motions did not raise it. BNSF responds that it "repeatedly and consistently challenged whether Mr. Ludlow met the causation element for his NFEPA [claim] before the District Court." Without question, BNSF's summary judgment and Rule 50(a) motions argued that Ludlow could not and had not proved the requisite "causal connection" between protected activity and termination. But BNSF never raised whether "motivating factor" or "determining factor" was the proper causation standard, an issue that has bedeviled Title VII courts and Congress for twenty-five years. Rather, that issue was first noted in BNSF's Rule 50(b) motion and then emphasized on appeal, no doubt an attempt to avoid the deferential standard of judicial review of an adverse jury verdict.

We cannot put the causation standard aside altogether because, in "determining whether the district court erred in denying a motion for [JMOL], it is the applicable law which is controlling, and not what the court announced the law to be in its instructions." Grand Labs., Inc. v. Midcon Labs of Iowa, 32 F.3d 1277, 1280 (8th Cir. 1994) (quotation omitted). Here, the trial context is critical. Ludlow's NFEPA retaliation claim proceeded on a "cat's paw" theory, arguing to the jury that biased BNSF subordinates -- primarily Wunker and Renney – used final decision-maker Shewmake "as a dupe in a deliberate scheme to trigger a [retaliatory] employment action." Qamhiyah v. Iowa State Univ. of Sci. & Tech., 566 F.3d 733, 742 (8th Cir. 2009) (quotation omitted). The Supreme Court considered a cat's paw retaliation claim in a pre-Nassar decision, Staub v. Proctor Hospital, 131 S. Ct. 1186 (2011). Staub was not even cited, much less overruled, in Nassar. In Bennett v. Riceland Foods, Inc., 721 F.3d 546, 551 (8th Cir. 2013), we applied Staub in deciding a post-Nassar Title VII retaliation claim, explaining:

> In a cat's paw case, an employer may be vicariously liable for an adverse
> employment action if one of its agents -- other than the ultimate decision

-9-

maker -- is motivated by discriminatory animus and intentionally and proximately causes the action. [Staub, 131 S. Ct. at 1190-91.]

The Nebraska appellate courts have thus far defined this element of a retaliation claim as requiring proof of a "causal link" between the employee's protected activity and the adverse employment action. See O'Brien v. Bellevue Pub. Sch., 856 N.W.2d 731, 741 (Neb. 2014) (public policy retaliation); Helvering v. Union Pac. R.R., 703 N.W.2d 134, 148 (Neb. App. 2005) (NFEPA retaliation). In construing NFEPA, Nebraska courts are guided by federal courts' interpretation of Title VII. Zalkins Peerless Wiping Co. v. Neb. Equal Opp. Comm'n, 348 N.W.2d 846, 848 (Neb. 1984). We conclude that, however the Supreme Court of Nebraska may ultimately resolve (or ignore) the Title VII motivating factor/determining factor debate in resolving other types of NFEPA claims, it would apply the intentional and proximate cause standard of Staub and Bennett to the unique causation problems presented by a cat's paw claim of vicarious employer liability.

Viewed from this perspective, we have no difficulty concluding that Ludlow presented sufficient evidence for a reasonable jury to find BNSF liable for unlawful retaliation under the cat's paw theory. There was strong evidence that Wunker and Renney harbored retaliatory animus against Ludlow for triggering and pursuing a forgery investigation that shed negative light on the Claims Department and could cost Wunker his job. The jury could find that, after Ludlow contacted BNSF police, Renney and Wunker sent distorted reports to their superiors regarding Ludlow's behavior. Williams testified that Renney appeared to be looking for a reason to terminate Ludlow. Within days of learning that Ludlow would meet with an OIG inspector, Wunker and Renney brought the kick incident to the attention of their superiors and recommended that Ludlow be terminated. During the conference call that led to Ludlow's termination, Wunker and Renney gave decision-maker Shewmake distorted representations of the kick incident, Ludlow's past workplace behavior, and his involvement in the VA investigation. Wunker and Renney were the

source of all or nearly all of the information possessed by Shewmake when he made the decision to terminate.

As the Court noted in <u>Staub</u>, 131 S. Ct. at 1193, "if the [employer's] independent investigation relies on facts provided by the biased supervisor -- as is necessary in any case of cat's paw liability -- then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor." When the material facts are disputed, as here, that is a question for the jury. See <u>Kramer v. Logan Cnty. Sch. Dist. No. R-1</u>, 157 F.3d 620, 624-25 (8th Cir. 1998). The trial evidence was sufficient to permit a reasonable jury to find that Shewmake did not independently investigate retaliatory misrepresentations made by Wunker and Renney in recommending Ludlow's termination, and therefore that Shewmake "merely serve[d] as the conduit, vehicle, or rubber stamp by which [those supervisors] achieve[d their] unlawful design." <u>Qamhiyah</u>, 566 F.3d at 742.

For these reasons, we conclude the district court did not err in denying BNSF's Rule 50(b) motion for JMOL.

### III. Jury Instructions

BNSF argues the district court committed plain error in instructing the jury that Ludlow need only prove that his protected activity was a "motivating factor" in the termination. See <u>Lopez v. Tyson Foods, Inc.</u>, 690 F.3d 869, 876 (8th Cir. 2012) (standard of review). This contention borders on the frivolous. As we have explained, the Supreme Court of Nebraska has held only that a "causal connection" must be proved. The district court's "motivating factor" instruction was not inconsistent with that general statement of this element; any error in elaborating on that standard would hardly be "plain." Moreover, even if BNSF *could* show plain error, it cannot show that the error "almost surely affected the outcome" of this cat's

paw retaliation claim. <u>Champagne v. United States</u>, 40 F.3d 946, 947 (8th Cir. 1994) (quotation omitted). The district court separately instructed the jury to find for BNSF if it determined that BNSF proved by a preponderance of the evidence that it would have fired Ludlow regardless of his involvement in the forgery investigation. Finally, because the jury returned a general verdict -- at BNSF's request -- "this court can only speculate as to the effect" of the motivating-factor instruction, an insufficient basis on which to conclude that BNSF's substantial rights were affected by a plain error. <u>Lopez</u>, 690 F.3d at 878.

## IV. Attorney's Fees and Nontaxable Costs

The jury awarded Ludlow damages of $235,369.00, substantially less than the amount he sought. Ludlow moved for an award of $358,027.43 in attorney's fees and $24,670.15 in nontaxable costs. BNSF filed multiple objections the district court placed in eleven categories. In a lengthy opinion, the court sustained six objections, in whole or in part, including a one-third reduction of the fee request "[b]ecause the case was significantly overvalued." The court granted Ludlow $206,514.13 in attorney's fees and $22,202.16 in nontaxable costs. On appeal, BNSF argues the court (i) abused its discretion in not further reducing the fee award by $72,759.50, and (ii) erred in awarding nontaxable costs or not reducing those costs by $6,327.87. "We review *de novo* the legal issues related to the award of attorney's fees and costs and review for abuse of discretion the actual award of attorney's fees and costs." <u>Sturgill v. United Parcel Serv., Inc.</u>, 512 F.3d 1024, 1036 (8th Cir. 2008).

The NFEPA provides that a "successful complainant shall be entitled to . . . reasonable attorney's fees, and costs." Neb. Rev. Stat. § 48-1119(4). When a statute mandates the award of reasonable attorney's fees, Nebraska courts look to a broad range of factors in determining the value of legal services rendered, including "the customary charges of the bar for similar services." <u>Craig v. Farmers Mut. Ins. Co.</u>, 476 N.W.2d 529, 535 (Neb. 1991) (quotation omitted). In interpreting the NFEPA's

remedial provisions, the Supreme Court of Nebraska has been guided by federal case law interpreting the NFEPA's "parent federal legislation." Airport Inn, Inc. v. Neb. Equal Opp. Comm'n, 353 N.W.2d 727, 734 (Neb. 1984).

**A. Attorney's Fees.** BNSF argues the attorney's fees award should be reduced for three reasons. First, the district court abused its discretion in awarding fees for a second attorney to assist in preparing for and taking Wunker's and Renney's depositions, work BNSF argues was "duplicative." In response, Ludlow submitted affidavits from "three highly respected trial attorneys" opining that the time records reflected proper litigation management to avoid duplication of work. The district court carefully evaluated this contention and concluded that the two attorneys performed separate functions in preparing for and taking those depositions and that the involvement of a second attorney was reasonable given the depositions' complexity, length, and importance. There was no abuse of discretion. See Webner v. Titan Distrib., Inc., 267 F.3d 828, 838 (8th Cir. 2001) (awarding fees for second attorney whose participation in deposition was justified).

Second, BNSF argues that the district court erred in awarding attorney's fees for counsel's travel time at a non-discounted rate. BNSF presented no evidence that local attorneys "will not bill for travel time or will discount their hourly rates." We have long recognized a "presumption . . . that a reasonable attorney's fee includes reasonable travel time billed at the same hourly rate as the lawyer's normal working time," Craik v. Minn. State Univ. Bd., 738 F.2d 348, 350 (8th Cir. 1984), absent a showing the award would be unreasonable, for example, because "the lawyer did not customarily charge clients for travel time, or . . . did not have other work that could have been done during that time had he not been traveling," Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381, 396 (8th Cir. 1987). As there was no such showing by BNSF, there was no abuse of discretion.

Third, BNSF argues that the district court abused its discretion by awarding $23,737.50 in attorney's fees and $3,682.00 in nontaxable costs for counsel's work with focus groups and jury consultants in preparation for trial. The district court rejected this objection, noting that, in support of his claim, Ludlow submitted expert opinions "that it is reasonable for a law firm to utilize trial consultants and in-house focus groups, that the two consultants were used in a reasonable manner, and that the use of two focus groups was a reasonable expense." BNSF presented no evidence to the contrary.

No Nebraska case has expressly addressed this issue. There is federal case law upholding awards for this type of preparatory work if it is reasonable. Planned Parenthood of Cent. N.J. v. Attorney Gen., 297 F.3d 253, 269 (3d Cir. 2002) (moot court preparation for oral arguments). We agree with the district court's prediction that the Supreme Court of Nebraska would hold that § 48-1119(4) authorizes the award of nontaxable costs, just as out-of-pocket expenses "reasonably charged by attorneys to their clients" may be recovered under comparable federal statutes. Warnock v. Archer, 397 F.3d 1024, 1027 (8th Cir. 2005) (§ 1988); see Sturgill, 512 F.3d at 1036 (§ 2000e-5(k)). Thus, in awarding fees and costs for use of focus groups and jury consultants, the district court did not abuse its substantial discretion to award "reasonable attorney's fees, and costs" under Neb. Rev. Stat. § 48-1119(4).

**B. A Second Nontaxable Cost Issue.** BNSF argues the district court erred in awarding $2,645.87 in computerized legal research (CLR) costs. In response, Ludlow submitted affidavits by three Nebraska attorneys opining that the actual cost of CLR research is customarily charged to clients in Nebraska legal markets and that the expenses incurred by Ludlow's attorneys were reasonable. No Nebraska appellate court has addressed whether CLR costs may be included in a fee award. The district court noted that the Eighth Circuit has held that the cost of CLR research "cannot be independently taxed as an item of cost in addition to the attorneys' fee award." Leftwich v. Harris-Stowe State Coll., 702 F.2d 686, 695 (8th Cir. 1983). However,

-14-

because the prevailing view among other circuits is to the contrary, the court in applying Nebraska law overruled BNSF's objection.

On appeal, BNSF argues that, in the absence of contrary Nebraska authority, the district court erred in refusing to follow Leftwich and awarding these expenses. We disagree. Leftwich, decided when CLR was in its infancy, vacated an award of $145.89 for Lexis research because "computer-aided research, like any other form of legal research, is a component of attorneys' fees and cannot be independently taxed." 702 F.2d at 695. In general, an award of reasonable attorney's fees may include litigation expenses if it is "the prevailing practice in a given community" for lawyers to bill those expenses separately. Missouri v. Jenkins, 491 U.S. 274, 287 (1989). Consistent with that general principle, Leftwich reflected customary billing practices at the time. But not today, when CLR research expenses are separately billed in many communities, a practice that can be readily defended because "[t]he cost of online research is normally matched with reduction in the amount of time an attorney researches," or with better quality research. In re UnitedHealth Group Inc. S'holder Derivative Litig., 631 F.3d 913, 919 (8th Cir. 2011). On this record, we cannot conclude the district court abused its discretion, applying Nebraska law, when it permitted the recovery of Ludlow's reasonable CLR costs, consistent with prevailing practice in the Nebraska legal marketplace. Cf. Trustees of Constr. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co., 460 F.3d 1253, 1258 (9th Cir. 2006).

The judgment of the district court is affirmed.

_____