Filed 9/24/14  Switzer v. Cal. Dept. of Corrections etc. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TERRI SWITZER,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>    Defendant and Appellant. | B246005<br><br>(Los Angeles County<br>Super. Ct. No. BC444513) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert L. Hess, Judge.  Affirmed in part; reversed in part.

Kamala D. Harris, Attorney General, Celine M. Cooper, Patricia A. Nevonen and Michael Yi, Deputy Attorneys General, for Defendant and Appellant.

LA Superlawyers, William W. Bloch; Klapach & Klapach and Joseph S. Klapach for Plaintiff and Respondent.

Plaintiff Terri Switzer brought the present action against her employer, the California Department of Corrections and Rehabilitation (CDCR), alleging failure to accommodate her psychiatric disability and to engage in an interactive process in violation of the Fair Employment and Housing Act (FEHA), Government Code section 12940, subdivisions (m) and (n).[1] Following a three-week bench trial, the trial court entered judgment for plaintiff, awarding her emotional distress damages of $35,000, an injunction against any future failure to accommodate, and attorney fees.

The CDCR contends on appeal that (1) substantial evidence did not support the trial court's finding that it failed to accommodate plaintiff's disability, (2) the trial court abused its discretion in entering a permanent injunction, and (3) the trial court failed to adequately explain the basis for its attorney fee award. We conclude that the trial court's findings were supported by substantial evidence and the attorney fee award was not an abuse of discretion. We thus affirm in significant part. However, while the trial court had discretion to enter a permanent injunction, the injunction it entered was overly broad. We therefore reverse the grant of an injunction and remand to the trial court to craft a new and different injunction consistent with the views expressed in this opinion.

## FACTUAL BACKGROUND

### I.      Background Events

Plaintiff is a teacher employed by the CDCR. Since 1994, she has worked at the men's prison in Lancaster, California (the prison or the Lancaster prison). She has taught both high school equivalency (GED) and adult basic education (ABE) classes.

#### A.      *The Lancaster Prison*

The Lancaster prison is divided into four facilities or yards, designated A, B, C, and D. There is a separate facility for minimum security prisoners, many of whom work

---

[1]      All subsequent undesignated statutory references are to the Government Code.

2

outside the prison for part of the day. The minimum security facility is outside the prison's secure perimeter.

Each prison yard contains two distinct areas. The main yard, which is subject to the highest security, contains inmate housing, an exercise yard, and a "program building" or "education building," which houses classrooms and a library. The doors that connect these secure areas to the outside require special keys, referred to as Folger-Adams keys. At all times relevant to this action, teachers were not permitted to carry Folger-Adams keys. Each prison yard also has a second area, sometimes referred to as a vocational area, which is separated from the main yard by a fence and is accessed through a port or gate area referred to as "work change." The vocational areas house classrooms, among other things. Only inmates of lower security classes are permitted in the vocational areas. The exterior doors of classrooms in the vocational areas do not require Folger-Adams keys.

### B.     The 1997 Inmate Attack

On January 6, 1997, Switzer was attacked by an inmate in a program building classroom. Switzer was not permitted to leave the classroom immediately, but was ordered by custodial officers to remain in the classroom for some time. Plaintiff's physical injuries were minor, but she suffered significant mental trauma and was off work for almost seven months.

When plaintiff prepared to return to work, she submitted a request for reasonable accommodation, in which she said she suffered from a "fear of being locked in [a] classroom complex and unable to get out" and "fear of locked doors and windowless enclosure[s]." She sought a key to the outer door of the education complex and pepper spray. She supported her request with a letter from her treating psychologist, Dr. Kathleen Murphy, who said Switzer was experiencing anxiety about being in a locked area with inmates and asked that Switzer be allowed to carry a Folger-Adams key or pepper spray for approximately one month.

3

The prison's Reasonable Accommodation Committee determined that, for security reasons, plaintiff could not be given a Folger-Adams key or pepper spray. However, the committee offered to reassign Switzer to a classroom in the vocational area of D yard, where she had immediate outside access. Effective August 4, 1997, Dr. Murphy released plaintiff to return to work "with no restrictions except being placed in a classroom where she has direct access to outside the building."

### C.    Plaintiff's Workers' Compensation Claim

Following the inmate attack, plaintiff pursued a workers' compensation claim for "psychiatric disability as a result of a cumulative trauma due to events occurring in the course of her employment." In a report dated October 16, 2000, Dr. James Wells, the agreed medical examiner (AME), found plaintiff "did undergo a significant change following [the January 1997 assault]. She was more wary, anticipatory of harm and developed phobic attitudes, particularly in dark and enclosed spaces. She says that her claustrophobia has somewhat alleviated over time, but significant residuals remain." Dr. Wells concluded that "[t]here appears to be a medical certainty that [plaintiff] does have a diagnosis of Specific Phobia and that diagnosis springs from the specific injury of January 6, 1997." He continued: "I believe that Ms. Switzer did experience a psychiatric disorder arising out of employment. I believe that the condition is now Permanent and Stationary for rating purposes. . . . [Plaintiff's] specific phobia would preclude her from a small segment of the open labor market; thus, there is a degree of Permanent Partial Disability." He concluded: "There is **Permanent Partial Disability** consisting of a syndrome of claustrophobia, vigilance, apprehension, anticipation of harm with lowered sense of mastery and lowered stress tolerance. . . . [¶] Ms. Switzer is capable of carrying

4

out her present assignment which has been modified to accommodate her psychiatric difficulty."[2]

In a December 18, 2000 letter clarifying his October 16, 2000 report, Dr. Wells said: "Having submitted the report of an Agreed Medical Evaluation in Psychiatry dated October 16, 2000, concerning Terri Switzer, I am now in receipt of an inquiry from the parties requesting clarification on the matter of work restrictions. . . . [¶] In regard [to] locale, the applicant does have a specific phobia in which anxiety is generated in dark or confined spaces. This was manifest in my office at the time of [the] interview. I believe that Ms. Switzer should be placed in a classroom in which there is relatively easy egress and where, to the extent possible, windows open onto open space. I believe that whether the classroom should have direct access to outside the building might be negotiable if ready egress were otherwise provided and if the setting was not one which initiated or intensified claustrophobic symptomatology. I consider this work restriction . . . derivative [of] the specific injury when she was attacked by the inmate in the classroom."

After he received Dr. Wells's report, the prison's associate warden issued a memo stating that "[e]ffective immediately and until further notice," plaintiff would "[u]nder no circumstances . . . be expected to work in the "Education Complex" areas[, i.e., a]reas with halled passages" and would remain in her present classroom "[u]ntil her classroom situation can be re-evaluated." As a result, plaintiff was assigned to a classroom in the vocational area of D yard, an arrangement that apparently continued until approximately August 2008.

## II. Plaintiff's August 2008 Transfer to the Bridging Program

Sometime after March 2007, the Lancaster prison became a "reception center" which received inmates new to the prison system. Because these inmates had not yet

---

[2]     The trial court observed that, from plaintiff's testimony, it appeared she interpreted the letter granting her permanent disability benefits as meaning that her duty restrictions/accommodations were also permanent.

been assigned security classifications, they were not permitted to go outside the secure perimeter or to attend regular education classes. As a result, a new educational program, referred to as the "bridging program," was implemented at Lancaster prison to allow unclassified inmates to receive educational credits. The bridging program required frequent testing, which was conducted in the classrooms in program buildings on the various yards. By August 2008, most, but not all, of the prison's academic teachers had been assigned to the bridging program.

In early August 2008, an incident occurred between plaintiff and a Muslim inmate in the D yard vocational area. As a result, on August 6, 2008, plaintiff was reassigned to teach in the bridging program and given a classroom in C yard.

## III.    The August 2008 Request for Accommodation

On August 7, 2008, plaintiff met with Patricia Castillo, one of the prison's return to work coordinators, and said that her new assignment in C yard did not comply with her 1997 request for reasonable accommodation. Plaintiff said she needed direct access to the outside, and that while her classroom provided direct access, the testing areas did not.

Castillo responded with a written memorandum, dated August 11, 2008, which the trial court characterized as an example "of the inadequate communication and miscommunication between the Lancaster administration and Ms. Switzer which occurred repeatedly thereafter."[3] The memorandum said the prison "is of the opinion that your present assignment meets your original request for reasonable accommodation" because two of the available testing rooms "have direct access to the outside by walking through the Program hallway to the exterior door, a distance of no more than 30 feet," plaintiff had a key to the exterior door of the classroom (but not to the outside of the building), and "there are multiple teachers in the same classroom during testing periods

---

[3]    The trial court noted that the letter reflected "a misunderstanding both of Ms. Switzer's issues and needs, and of the physical arrangements in the program building."

and additionally, a custody officer is posted in the hall area of the Program office for any security concerns." The memorandum also offered plaintiff the option of working in the minimum security facility, Monday through Friday, 12:30 p.m. to 9:00 p.m., and said that if plaintiff preferred that assignment, she should contact the principal "no later than [the] close of business Wednesday, August 13, 2008." Finally, the memorandum said that if plaintiff wanted her accommodation to be reassessed, "you may be required to submit updated medical verification."

Plaintiff testified that the C yard position did not satisfy her accommodation request because the testing classrooms did not have exits to the outside. These classrooms exited into an interior hallway, from which the outside could be accessed only through doors secured with a Folger-Adams key. Further, plaintiff did not believe the offer of a position in the minimum security facility was genuine because no such position then existed.[4]

After she received the August 11 memorandum, plaintiff sought a meeting with Warden Brian Haws. The two met on or about September 23, 2008, and Warden Haws suggested that plaintiff submit a list of alternative positions consistent with the accommodation she sought. Plaintiff did so the following day, proposing five different positions for which she was qualified and which met her accommodation request.

Warden Haws responded in writing on October 1, 2008, stating that the prison was in full compliance with plaintiff's 1997 request for reasonable accommodation, but that if plaintiff felt "unable to report to any of [her] assigned work areas or . . . to perform [her] assigned duties because of any health concerns," she should "inform [her] immediate

---

[4]    Although the court acknowledged plaintiff's testimony, it credited other testimony "that there was a perceived need for a new program in the Minimum Security Facility at those hours, and that the classroom to be used had immediate direct outside access comparable to classrooms in the vocational areas. The Court infers that had Ms. Switzer responded affirmatively, this class would have been created for her; the Court accepts the testimony that it was in fact created for a different teacher. Ms. Switzer did not discuss this offer with anyone in Lancaster administration, and she did not respond to it." (Fn. omitted.)

7

supervisor of the reasons why and request to be temporarily assigned alternative tasks for that day." Alternatively, if plaintiff wished to have her request for reasonable accommodation reassessed, she should "submit an updated medical verification . . . together with the Request for Reasonable Accommodation form to the Office of Employee Wellness."

During September and October 2008, plaintiff was assigned to an office in the vocational area of C yard. She was not provided with teaching materials and did not teach any students during this period. At the direction of Glenn Brooking, the prison's principal, plaintiff was asked daily whether she could test bridging inmates in the program area of C yard; when plaintiff said she could not, she was given "alternative assignments," which consisted primarily of sharpening pencils.

On December 5, 2008, plaintiff was transferred from the education department to plant operations while she was investigated for unrelated misconduct. While in plant operations, plaintiff worked as a clerical receptionist. The work area to which plaintiff was assigned had windows and outside access.

## IV. Plaintiff's March 2009 Return to the Bridging Program and the April 2010 Notice of Adverse Action

In late March 2009, plaintiff was told that she would be transferred back to the bridging program effective April 1. Plaintiff was concerned that she would again be asked to test and tutor inmates in classrooms without direct outside access, and so on March 26, she submitted a new request for reasonable accommodation. The request stated that plaintiff suffered from "panic attacks from being locked in [a] classroom/work area and being unable to get out IMMEDIATELY (claustrophobia)." Plaintiff requested a "classroom/work area location with DIRECT outside access" and noted that "previous teaching assignment locations have met this accommodation and one of those rooms will soon be available."

After March 26, 2009, plaintiff was temporarily reassigned to the bridging program in the vocational area of D yard. Plaintiff was given an office and classrooms

with windows and direct outside access. However, on April 21, 2009, the D yard teachers were told that they were being "loaned" to C yard, and plaintiff was directed to work with inmates in the secured housing area of C yard. Plaintiff told her supervisor, Steve Arriola, that she had an accommodation that permitted her not to enter C yard, and Arriola said that if she refused to comply with his instruction, he would write her up. She was again directed to test inmates on C yard on April 23, 2009, and plaintiff again refused to go.

A year later, on April 15, 2010, plaintiff received a nine-page "Notice of Adverse Action." Most of the document was redacted at trial,[5] but one of the many incidents identified as grounds for the adverse action was as follows: "On or about April 21, 2009, at approximately 0800 hours[,] and on or about April 23, 2009, at approximately 0910 hours[,] Mr. Arriola directed the Facility 'D' staff to report to Facility 'C' to facilitate the bridging inmates. You contacted Mr. Arriola and informed him that you could not go . . . into the housing units due to work restrictions. Mr. Arriola asked you if you understood you were being directed to go, to which you replied 'yes' however you were refusing to do anything that would violate you[r] restrictions. According to the Return to Work Coordinator, Patty Castillo[,] there [were] no work restrictions on file that precluded you from doing as instructed by your supervisor."

Plaintiff remained in the D yard vocational area through early 2010, when the bridging program was discontinued. At that time, she was reassigned to a position as an academic teacher on C yard vocational area, where she remained through the time of trial.

## V.    The CDCR's Response to Plaintiff's Assertion of an Existing Accommodation

Beginning in August 2008, Castillo reviewed some of the records in plaintiff's file to determine the scope of plaintiff's accommodation. Based on the limited records she reviewed, Castillo believed that plaintiff had been given an accommodation for only a

---

[5]     The parties stipulated that no evidence or argument would be presented regarding the other incidents discussed in the Notice of Adverse Action.

single month in 1997. As a result, Castillo and others repeatedly stated that they had no documentation supporting a request for permanent accommodation in the form of direct access from a classroom to the outside, and they repeatedly asked plaintiff to obtain new or updated medical verification.

Plaintiff did not submit an updated medical report until sometime in 2011. The reasons for the several year delay were never made entirely clear, but the trial record reveals the following. Apparently in connection with a pending workers' compensation claim, an agreed medical examination with Dr. Bruce Rubenstein was scheduled for October 6, 2008. The appointment was cancelled by Dr. Rubenstein for unexplained reasons on October 2, 2008. An appointment was then made for plaintiff to be seen by AME Dr. Samuel Miles on June 3, 2010. That appointment was cancelled and rescheduled for March 17, 2011, when plaintiff finally was examined.

It appears that the appointment with Dr. Miles was set up sometime prior to April 16, 2009, pursuant to an agreement between Luis Cubero, a State Compensation Insurance Fund (SCIF) claims representative, and plaintiff's workers' compensation attorney. There is no information in the record about why the appointment was initially scheduled for June 2010 (i.e., more than a year later), or why it was ultimately rescheduled for March 2011. Plaintiff testified that she did not know why the appointment with Dr. Miles was scheduled so far in the future and she had no role in cancelling the 2010 appointment.

## VI.    The April 2011 Agreed Medical Examination Report

In relevant part, Dr. Miles's April 4, 2011 agreed medical examination report says plaintiff suffers from a specified phobia and requires accommodations to perform the essential functions of her job, as follows:

"[Plaintiff] sustained injury on January 6, 1997 when she was assaulted by a student. She subsequently developed excessive fears in situations which included being in a small closed space, being in a space in which she could not see outside, and having difficulty leaving a place. Exposure to these stimuli provoke an anxiety response almost

10

each time. She recognizes the fear is excessive and unreasonable. She tries to avoid these situations as much as possible. Sometimes she is able to endure being in one of these situations. Thus she meets [the] criteria for a diagnosis of specified phobia, situational type. . . .

"[Plaintiff] is able to perform the essential functions of her job as a teacher with accommodations. Without accommodations, her capacity to function in that role would be sufficiently impaired by her anxiety that she would be incapable of performing the job.

"Reasonable permanent accommodations include the necessity that her work space be one in which she has direct access to a direct exit to the outside of the building. . . .

"Ms. Switzer is not able to work in a prison environment without the capacity for immediate independent egress from a work area to the outside. She should permanently be precluded from work in the living areas of the prison, or other locations which can only be accessed directly via sally ports controlled by custody officers.

"She is not able to work in a room without windows."

## VII.    Interactions Subsequent to April 2011

On August 10, 2011, return to work coordinator Tracee Simpson acknowledged receipt of Dr. Miles's report and "invite[d] [plaintiff] to engage in the interactive process." Among the options Simpson said might be available to plaintiff was a "reasonable accommodation": "If you believe you are disabled and that a reasonable accommodation would enable you to perform the essential functions of your current position . . . you may request a reasonable accommodation." Other options included "medical transfer/demotion," temporary disability, retirement, and voluntary resignation. The letter also enclosed an authorization for the release of medical information form that will "allow us to request your doctor to review the essential functions of your job in order to identify any limitations you may have." Plaintiff was asked to return the enclosed forms by August 25, 2011, to "notify us of the options you would like to discuss and allow us to request your doctor to review the essential functions of your job in order to identify any limitations you may have."

11

On September 9, 2011, plaintiff was informed by Jan O'Neill, a section chief in the Office of Employee Wellness in Sacramento, that "further processing of your requests for reasonable accommodations" had been transferred from the prison to the Office of Employee Wellness in Sacramento. O'Neill received a response from plaintiff's attorney, William Bloch, requesting that O'Neill not have any direct contact with his client. O'Neill attempted to arrange a meeting with plaintiff and Bloch to discuss plaintiff's accommodation request, but Bloch said there was no need for further communication because the case was going to trial. As a result, there was no resolution of plaintiff's request for accommodation.

## PROCEDURAL HISTORY

Plaintiff filed the present action on August 26, 2010. Several causes of action were dismissed prior to trial, and plaintiff's remaining claims—for failure to accommodate a disability in violation of FEHA and failure to engage in an interactive process—were tried to the court over 16 days between May 29 and June 19, 2012.

The trial court issued a lengthy statement of decision on September 26, 2012, which said in relevant part as follows:

"The Return to Work Coordinator Medical Personnel Action Reference Manual addresses the subject of reasonable accommodations. As no party has suggested it does not accurately set forth the appropriate standard, it will be quoted as a convenient summary. It defines a person with a disability as one who 'has an impairment that limits one or more major life activities.' Impairments may be physical or mental. 'Temporary non-chronic impairments that do not last for a long time and that have little or no long term impact usually are not disabilities.'

"It provides, in pertinent part:

"The purpose of this policy is to eliminate barriers to employment for qualified individuals with disabilities without waiving the essential function(s) of the job or position in order to retain valued and experienced qualified employees. . . .

12

"An employer must make [reasonable accommodation] for the known physical or mental disability of an employee, unless doing so will create undue hardship. The [reasonable accommodation] may be, but is not limited to:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"* Job restructuring, e.g., modifications of work hours, change in time base, job sharing, and/or changes in job duties, authorizing leave of absences and/or use of leave credits, providing frequent rest breaks.

"* Reassignment to a vacant budgeted position for which the employee meets the minimum qualifications and can perform the essential job function(s), e.g., alternative job assignments through transfer or reclassification.

"*The [reasonable accommodation] must not require the waiver of an essential function(s).*

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"An employee does not have to use the phrase, 'reasonable accommodation.' It is sufficient for the employee to advise the employer [or return to work coordinator] of their need for adjustment or change that will allow the employee to perform the essential function(s) of their position; or of their inability to perform the essential function.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"*It shall never be assumed that an employee is disabled, has a medical condition, or requires [reasonable accommodation]. If the employee states that they need assistance to perform their job due to a disability or medical condition, medical verification of work limitations outlining the need for [reasonable accommodation] will be required. A medical diagnosis shall not be requested.*

"The Court is persuaded that there was nothing inappropriate about CDCR's wish in 2008 to seek an update on Ms. Switzer's mental condition to determine whether (and what) accommodation was still necessary. This was particularly true since it appeared Ms. Switzer was not and had not been treating for this mental condition since Dr. Wells' report in 2000.

"The conflict arose because of conflicting assumptions. On the one hand, Ms. Switzer (and Valerie Lee, the union steward) erroneously assumed that Ms. Switzer's permanent partial disability through workers' compensation equated to a right to a permanent accommodation, which could never be reviewed or questioned. On the other hand, Ms. Castillo, Mr. Cubero, and probably others apparently assumed that whatever accommodation Ms. Switzer had been granted in 1997 had been temporary and had long expired, and Ms. Switzer was entitled to nothing until *she* proved otherwise.

"The problem was further exacerbated by the extraordinary and largely unexplained delay in obtaining an updated evaluation of Ms. Switzer's condition. She had originally been scheduled to see Dr. Bruce Rubenstein on October 6, 2008, but the appointment apparently was canceled because the doctor felt treating state employees was a conflict of interest. Neither Dr. Kathleen Murphy nor Dr. James Wells—who had seen Ms. Switzer in 1997 and 2000, respectively—[was] available to see her again. Dr. Eileen McGrath was her primary care physician, treating her for (among other things) hypertension, and was not an appropriate person to do a mental evaluation.

"On April 16, 2009, Mr. Cubero wrote to Warren Green, apparently Ms. Switzer's workers compensation attorney, to confirm that an appointment had been set up for plaintiff to be evaluated by Dr. Samuel Miles. For reasons never explained to the Court, that appointment was not scheduled to occur until June 3, *2010*, almost 15 months later. Indeed, even that appointment was rescheduled, and Dr. Miles did not see her until March 17, *2011*.[6] Indeed, although Dr. Miles' report was dated April 4, 2011, and was sent to Heidi Pelayo at the SCIF, Ms. Castillo and Ms. O'Neill apparently did not review it until August 2011.

"In addition, it appears to the Court that the return to work staff and others at Lancaster had a perception that Ms. Switzer's self-reported limitations on the physical

---

**6** "Ms. Castillo testified that as return to work coordinator, she could not direct that employees submit to medical evaluation[;] however, the office of employee wellness (above Ms. Castillo's level) could direct an evaluation as part of the fitness for duty process. This testimony still does not explain why this review took so long to occur."

14

environments in which she could work or be present had expanded over time, or that they changed depending on other circumstances. This perception may have contributed to skepticism about her claims. This perception may have been, in part, the result of unclear description of what Ms. Switzer's limitations were, both by Ms. Switzer and by her doctors, dating back to 1997.

"The most serious incidents in this chain of events were the two occasions when Ms. Switzer was written up for her refusal to participate in facilitat[ing] bridging inmates by entering locked inmate housing, which subsequently was part of the Notice of Adverse Action. At trial, Ms. Switzer clearly communicated that she felt going into housing units was unnecessary and ineffectual; it is probable that she communicated this attitude to her supervisors. The Court's ultimate conclusion is that while there were occasions when it [was] necessary for teachers to enter inmate housing units, they were infrequent, and arrangements could have been made to exchange duties among teachers to accommodate Ms. Switzer's claustrophobia.

"The Court accepts Dr. Reading's conclusion that Ms. Switzer had a specific phobia resulting from the inmate attack in January 1997 which was never treated, but only accommodated. The August 2008 withdrawal of what Ms. Switzer had thought was a permanent accommodation resulted in anxiety and depression which negatively affected both Ms. Switzer's perception of events and her interactions with others. CDCR's inadequate investigation, inadequate communication or miscommunication, the infinitely protracted process of trying to develop essential function lists, and a truly unconscionable delay in having Ms. Switzer evaluated psychologically, all exacerbated Ms. Switzer's adjustment disorder. It defies belief that Ms. Switzer's March 26, 2009, request for reasonable accommodation had not been resolved by the time Mr. Bloch shut down the process in September 2011.

"The Court concludes that Ms. Switzer is and was at all pertinent times a person with a disability. The Court also concludes that Ms. Switzer is and was at all pertinent times able to perform the essential functions of her job as a bridging or academic teacher at Lancaster with reasonable accommodations. The Court therefore further concludes

15

that Ms. Switzer has proven her claims for both disability discrimination and failure to engage in the interactive process.

"The damages claimed by Ms. Switzer are essentially for emotional distress. The Court has carefully considered all the evidence, and has concluded that she should be awarded the sum of $35,000.00. The Court further finds that Ms. Switzer's need for a reasonable accommodation is permanent, and that she has proven her entitlement to a permanent injunction substantially along the lines of Dr. Reading's conclusions.

"In its Request for Statement of Decision, CDCR asks the Court to answer a series of questions. Some of these have been discussed above. To the extent the Court deems further discussion appropriate, it makes the following points.

"*First*, Dr. Wells' reports in 2000 gave no suggestion that the need for a reasonable accommodation would disappear over time. Moreover, there was no time limit placed on the accommodation given by Lancaster following receipt of his reports. The lapse of time during which Ms. Switzer apparently did not receive treatment for these conditions until the sudden need for reassignment in August 2008 meant it was not reasonable for Lancaster to seek updated information on whether there was a continued need for accommodation. However, Lancaster's official position—as articulated by Ms. Castillo—was not that updated information was needed to reconfirm a continuing need for accommodation, but rather that Ms. Switzer had no accommodation at all.

"*Second*, in August 2008, Ms. Switzer had no updated information to give Lancaster, and the Court is not persuaded that it was Ms. Switzer's obligation to find a doctor and obtain a further psychiatric review (presumably at her own expense). Since the prior evaluation had not placed a time limit on the need for accommodation, the Court is persuaded that the onus was properly on Lancaster to take the necessary steps to have an updated review done if it wanted updated information.

"*Third*, the Court is unwilling to charge Ms. Switzer with responsibility for the delays before the examination occurred. The Court infers, in the absence of credible evidence to the contrary, that both Dr. Rubenstein and later Dr. Miles were chosen to perform the updated evaluation because they were on a CDCR-approved list of persons to

16

perform this type of service. CDCR was aware of the delay before the examinations and evaluations would occur, but chose not to make alternate arrangements to advance the process.[7] The Court finds no 'waiver' by Ms. Switzer's acceptance of this arrangement.

"*Fourth*, Ms. Switzer began treating with Ms. Schaad in December 2009, well *after* CDCR and/or Mr. Cubero had chosen Dr. Miles to do the evaluation. The immediate need for that treatment was not the inmate attack which had led to the specific phobia, but rather the anxiety disorder resulting from the ongoing dispute with Lancaster over her accommodation. Her 'failure to advise CDCR that she was treating with Ms. Schaad and failure to request medical verification from Ms. Schaad' did *not* cause a breakdown in the interactive process.[8]

"*Fifth*, the August 11, 2008, memo offering to assign Ms. Switzer to the Minimum Yard was apparently the only communication from Lancaster to Ms. Switzer on this subject. While Ms. Switzer did not respond, the Court rejects the notion that this single memo was sufficient to discharge Lancaster's duty to accommodate, particularly in view of its other content.

"*Sixth*, on the question whether going into housing units was an 'essential function' of a bridging teacher, the CDCR's Personnel Action Reference Manual defines 'essential functions' as '[f]undamental job duties of the position or classification. It is those functions the individual must be able to perform unaided or with the assistance of [Reasonable Accommodation].' There was insufficient credible evidence presented by CDCR to persuade the Court that facilitating bridging inmates inside the housing units was an essential function as opposed to a 'marginal function.' The need to facilitate

---

**7** "Since one purpose of the examination supposedly was to have the examiner evaluate Ms. Switzer's ability to perform the essential functions of her job, the lack of an approved essential functions list at different times and for different positions may have contributed to the delay. This situation was not of Ms. Switzer's making."

**8** "Indeed, there was no credible evidence that a report from Ms. Schaad would have been sufficient, especially since Dr. Miles' qualifications were significantly different than those of Ms. Schaad."

17

inmates in the housing units arose relatively rarely, and the argument why it was 'essential' was not well developed.  In addition, the definition of essential function permits performance with the assistance of a reasonable accommodation, which in Ms. Switzer's case would have been the temporary exchange of duties among teachers when facilitating was necessary."  (Internal record references and some fns. omitted.)

Judgment was entered on October 15, 2012, and notice of entry of judgment was served October 29, 2012.  Plaintiff filed a motion for attorney fees and costs on December 14, 2012.  The trial court granted the motion on April 29, 2013, awarding fees of $579,800 and costs of $64,739.66.  The CDCR timely appealed from the judgment and attorney fee order.


## STANDARD OF REVIEW


The CDCR challenges the trial court's findings that it failed to reasonably accommodate plaintiff and to appropriately engage in the interactive process.  With regard to these issues, we apply the substantial evidence standard of review.  "'Substantial evidence means evidence which is of ponderable legal significance— evidence which is reasonable in nature, credible and of solid value.  [Citation.]'  (*Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099.)  'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.  [Citations.]"  [Citation.]'  (*Estate of Young* (2008) 160 Cal.App.4th 62, 75-76.)  'We may not reweigh the evidence and are bound by the trial court's credibility determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment.  [Citation.]'  (*Id.* at p. 76.)  The testimony of a single witness may be sufficient to constitute substantial evidence.  (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)"  (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969.)

18

The CDCR also challenges the trial court's entry of a permanent injunction and award of attorney fees. The grant of a permanent injunction and award of attorney fees generally are reviewed for abuse of discretion; to the extent there are any disputed factual issues, the trial court's findings are reviewed for substantial evidence. (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc*. (2014) 225 Cal.App.4th 786, 801 [permanent injunction]; *Soni v. Wellmike Enterprise Co. Ltd*. (2014) 224 Cal.App.4th 1477, 1481 [attorney fees].)

## DISCUSSION

I.     **Substantial Evidence Supported the Trial Court's Conclusions That the CDCR Failed to Reasonably Accommodate Plaintiff's Disability and to Engage in the Interactive Process**

A.     *Legal Framework—Failure to Accommodate and to Engage in the Interactive Process*

Plaintiff alleged the CDCR breached its duty to provide her a reasonable accommodation in violation of FEHA, section 12940, subdivision (m). Subdivision (m) imposes on the employer the obligation to make reasonable accommodation: "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California . . . [¶] (m) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (m).) However, an employer is not required to make an accommodation "that is demonstrated by the employer or other covered entity to produce undue hardship . . . to its operation." (*Ibid*.)

The elements of a claim for failure to accommodate under subdivision (m) are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability. (*Scotch v. Art Institute of California* (2009) 173

19

Cal.App.4th 986, 1009 (*Scotch*).) The plaintiff bears the burden of proving his or her ability to perform the essential functions of a job with accommodations. (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 977 (*Nadaf-Rahrov*).)

"The term 'reasonable accommodation' is defined in the FEHA regulations only by means of example: '"Reasonable accommodation" may include either of the following: [¶] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [¶] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.' (§ 12926, subd. (n); see Cal. Code Regs., tit. 2, § 7293.9, subd. (a); accord, 42 U.S.C. § 12111(9).)" (*Scotch*, *supra*, 173 Cal.App.4th at p. 1010.) Several appellate courts have adopted the definition of "reasonable accommodation" found in the federal Equal Employment Opportunity Commission (EEOC) interpretive guidance on the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) (ADA)—i.e., "'a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired.'" (*Scotch*, *supra*, at p. 1010; e.g., *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at pp. 975-976.)[9]

Plaintiff also alleged the CDCR failed to engage in an "interactive process" as required under section 12940, subdivision (n). Section 12940, subdivision (n) makes it unlawful "[f]or an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable

---

[9] The *Nadaf-Rahrov* court reasoned, "[b]ecause the California Legislature has modeled the reasonable accommodation requirements of section 12940[, subdivision] (m) and 12940[, subdivision] (n) on the parallel federal requirements, the EEOC's definition of 'reasonable accommodation' appropriately guides our construction of the state laws." (166 Cal.App.4th at p. 974.)

20

accommodation by an employee or applicant with a known physical or mental disability or known medical condition."

'"The "interactive process" required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively. [Citation.] Ritualized discussions are not necessarily required.' [Citation.]" (*Scotch*, *supra*, 173 Cal.App.4th at p. 1013.) It "imposes burdens on both the employer and employee. The employee must initiate the process unless the disability and resulting limitations are obvious. 'Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, . . . the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.' [Citation.]" (*Ibid*.)

### B. The CDCR's Failure to Accommodate

The CDCR contends substantial evidence did not support the trial court's conclusion that it failed to reasonably accommodate plaintiff's work restrictions because it (1) offered her a teaching position in the minimum security facility, (2) assigned her temporary alternative tasks when she said she could not enter testing classrooms, and (3) allowed her to perform other teaching duties when she could not enter the housing units. Further, the CDCR claims it did not fail to accommodate plaintiff by disciplining her for failing to enter the housing units in April 2009, because it did not then have medical verification of her inability to do so. For the reasons that follow, we conclude that substantial evidence supported the trial court's contrary conclusions.

### 1. The September 2008 Offer to Teach in the Minimum Security Facility

The CDCR contends that it reasonably accommodated plaintiff by offering her a position in the minimum security facility, which was located outside the prison's secure perimeter. The offer came in an August 11, 2008 memorandum from Castillo to plaintiff,

21

which said the CDCR was "of the opinion that your present assignment meets your original request for reasonable accommodation," but offered plaintiff the option of "[w]orking in Minimum Security Facility, Monday through Friday, work hours of 12:30 PM to 9:00 PM." The memorandum said that if plaintiff preferred this assignment, she should contact Principal Brooking "no later than close of business Wednesday, August 13, 2008"—i.e., within two days. The memorandum also suggested that plaintiff might be required to submit updated medical verification to substantiate her need for an accommodation and "enclose[d] a Request for Reasonable Accommodation to be utilized in this process." (Emphasis omitted.)

The trial court credited testimony that this was a genuine offer, and it concluded that had plaintiff responded affirmatively, a class in the minimum security facility would have been created for her. However, the court noted that Castillo's August 11 memorandum was apparently the only communication from the CDCR to plaintiff regarding the minimum security facility offer, and while plaintiff did not respond, "the Court rejects the notion that this single memo was sufficient to discharge Lancaster's duty to accommodate, particularly in view of its other content."

Substantial evidence supports the trial court's conclusion. The employer's obligation to work with a disabled employee to find a reasonable accommodation does not end with a first attempt at accommodation. Instead, once the employee initiates the interactive process, "the employer's obligation to engage in the process in good faith is continuous. '[T]he employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find accommodations that really work . . . .' (*Humphrey v. Memorial Hospitals Ass'n* (9th Cir. 2001) 239 F.3d 1128, 1138.)" (*Scotch*, *supra*, 173 Cal.App.4th at p. 1013.) Whether an employer has engaged in the interactive process and reasonably accommodated an employee's disability generally are questions of fact subject to

substantial evidence review. (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193; *Prilliman v. United Air Lines, Inc*. (1997) 53 Cal.App.4th 935, 954.)

The Ninth Circuit Court of Appeals discussed the employer's continuing burden to work with an employee to find a reasonable accommodation in *Humphrey v. Mem'l Hosps. Ass'n*, *supra*, 239 F.3d 1128 (*Humphrey*). There, the employee suffered from obsessive compulsive disorder that made it difficult for her to arrive at work on time. The employer initially accommodated the employee by offering her a flexible work schedule, but when that was not successful, it denied her request to work from home and ultimately terminated her. (*Id.* at pp. 1130-1133.) The Ninth Circuit held that as a matter of law, the employer failed to reasonably accommodate the employee as required by the ADA. The court explained that although the employer properly initiated the interactive process and offered an initial accommodation, once it became clear that the accommodation was not working, the employer had a duty to explore further arrangements. (*Id.* at p. 1138.) Instead, when plaintiff asked to work at home, the employer "denied her request without suggesting any alternative solutions, or exploring with her the possibility of other accommodations. Rather than fulfill its obligation to engage in a cooperative dialogue with [employee], [the employer's] e-mail suggested that the matter was closed . . . . [Memorial Hospitals Association's] rejection of Humphrey's work-at-home request and its failure to explore with Humphrey the possibility of other accommodations, once it was aware that the initial arrangement was not effective, constitutes a violation of its duty regarding the mandatory interactive process." (*Id.* at pp. 1138-1139.)

The present case is analogous. Plaintiff testified that she received Castillo's August 11 memorandum "[s]omewhat after" August 11, 2008, and thus the trial court reasonably could have concluded that plaintiff did not have an adequate opportunity to consider the proposed accommodation before it expired on August 13. Further, there is abundant evidence that the CDCR never spoke with plaintiff about the minimum security offer or otherwise responded substantively to her request for an alternative assignment. Plaintiff testified that she repeatedly tried to contact Brooking regarding her assignment

23

after August 11, but he did not return her calls. Ultimately, when she was unable to reach Brooking, she requested a meeting with Warden Haws, which took place on September 22, 2008. Warden Haws asked plaintiff to provide a list of assignments she felt she could do, and plaintiff responded in writing the following day, requesting that she be assigned to a classroom with direct outside access and proposing five alternative assignments for which she was qualified. Warden Haws's October 1, 2008 response did not address any of these five alternative positions, but instead reiterated the CDCR's position that it was "in full compliance with" plaintiff's 1997 request for reasonable accommodation. Taken together, these facts support the trial court's conclusion that although the CDCR made an initial offer of accommodation, it failed to engage in "cooperative problem solving" with plaintiff when she sought a different accommodation. Indeed, as in *Humphrey*, the CDCR "denied [plaintiff's] request without suggesting any alternative solutions, or exploring with her the possibility of other accommodations." (*Humphrey*, *supra*, 239 F.3d at p. 1138.)

### 2. The 2008 "Temporary Alternative Teacher Tasks"

The CDCR contends that it reasonably accommodated plaintiff's inability to test bridging students in the fall of 2008 by "assigning her temporary alternative teacher tasks such as preparing student files and testing materials." The record reflects that the "alternative assignments" plaintiff was given throughout this period consisted primarily of sharpening pencils. The CDCR cites no authority—and we are not aware of any—for the proposition that requiring a credentialed teacher to spend entire days sharpening pencils is a "reasonable" accommodation as a matter of law.

### 3. The 2009 Assignment of Alternative Tasks

The CDCR contends it accommodated plaintiff in April 2009 by allowing her to perform alternative teacher tasks in her office instead of facilitating inmates in the housing units. While it is true that plaintiff performed alternative tasks on several days in April 2009 instead of entering the housing units, it is also the case—as the CDCR itself

acknowledges—that plaintiff was disciplined for refusing to enter the housing units. The CDCR cites no authority for the proposition that permitting an employee with a disability to perform alternative tasks *but disciplining her as a result* constitutes a reasonable accommodation. (See *Reese v. Barton Healthcare Sys.* (E.D. Cal. 2010) 693 F.Supp.2d 1170, 1175-1176, 1187 [reasonable juror could conclude that employer failed to reasonably accommodate lab technician where, although employer never forced technician to perform more exams than she said her disability permitted, it harassed and shamed technician about her disability, reduced her hours, and disciplined her].)

### C. Failure to Engage in the Interactive Process

The CDCR contends that even if the trial court was correct in concluding that reasonable accommodations would have allowed plaintiff to perform the essential functions of her job, it was not required to provide those accommodations because plaintiff failed to engage in the interactive process and was responsible for its breakdown. Specifically, the CDCR urges that it repeatedly asked plaintiff to provide updated medical verification of her work restrictions, but plaintiff refused to do so. As a result, the CDCR says, it had no duty to accommodate plaintiff until 2011, when plaintiff finally provided updated medical information.

Although the duty to engage in the interactive process is separate from the duty to make reasonable accommodations, the employer will be liable for a failure to accommodate only if it bears responsibility for the breakdown of the interactive process. (*EEOC v. Sears, Roebuck & Co.* (7th Cir. 2005) 417 F.3d 789, 797.) Thus, for example, in *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 265-267, the court held the employer was not entitled to summary judgment because it failed to establish the absence of a triable issue of material fact with respect to reasonable accommodation or that the employee was responsible for the breakdown in the interactive process.[10] Similarly, in

---

[10] "On these conflicting and equivocal facts, it cannot be said that Wells Fargo met its burden of establishing the absence of a triable issue of material fact with respect to

25

*EEOC v. Sears, Roebuck & Co.*, *supra*, 417 F.3d at pages 805-808, the court held the employer was not entitled to summary judgment where the employee made several requests for accommodations "which Sears simply denied." We therefore consider whether substantial evidence supported the trial court's finding that the CDCR was responsible for the breakdown of the interactive process.

       1.      <u>The Interactive Process Prior to the First Failure to Accommodate</u>
                <u>(August to November 2008)</u>

As we have said, the first failure to accommodate occurred between August and November 2008, when plaintiff daily was asked whether she could test inmates in the program/education area and ordered to sharpen pencils when she said she could not. During this period, the CDCR took the position that any accommodation plaintiff had been afforded in 1997 and 2000 had been intended for only a short period and had expired prior to 2008. It thus asserted that it had *no* duty to accommodate plaintiff's disability until plaintiff submitted updated medical information.

The CDCR repeats this position on appeal, suggesting that it could not rely on the 2000 AME report from Dr. Wells because the report did not contain specific work limitations and did not indicate whether plaintiff could enter the program building or housing units. Further, the CDCR says, the 2000 AME report from Dr. Wells did not entitle plaintiff to an accommodation in 2008 because plaintiff's work limitations "may have resolved since 2000." For the reasons that follow, the CDCR errs.

---

reasonable accommodation or that [plaintiff] Jensen was responsible for the breakdown in the informal, interactive process. It is possible that Jensen was not acting in good faith by adding to her list of restrictions for the purpose of discouraging job offers, or that her list of restrictions was unworkable and that she was simply unqualified for any opening at the bank during the period after the robbery which met her restrictions and qualifications. But Wells Fargo did not establish that there were no disputed facts concerning these points, and, as the moving party, failed to meet its burden to establish a right to summary judgment on the FEHA claim." (*Jensen*, *supra*, 85 Cal.App.4th at pp. 266-267, fn. omitted.)

As an initial matter, we do not agree that Dr. Wells's report did not clearly define plaintiff's work restrictions. As the trial court noted, Dr. Wells's report said plaintiff had a "Permanent Partial Disability" consisting of "a syndrome of claustrophobia, vigilance, apprehension, anticipation of harm with lowered sense of mastery and lowered stress tolerance." Dr. Wells opined that plaintiff was "capable of carrying out her present assignment *which has been modified to accommodate her psychiatric difficulty.*" (Italics added.) The modification was described as follows: "[Plaintiff] said that the educational complex has no windows and she could not work there. She said that she was presently assigned in the vocational area which has large windows and access to the outside." Following receipt of Dr. Wells's report, the prison's associate warden issued a memorandum directing that "until further notice . . . [u]nder no circumstances will Ms. Switzer be expected to work in the 'Education Complex,' [i.e., a]reas with halled passages." Further, "[u]ntil her classroom situation can be re-evaluated, Ms. Switzer shall remain in her present classroom." Taken together, Dr. Wells's report and the associate warden's memorandum demonstrate, contrary to the CDCR's contentions, that Dr. Wells's report contained specific work limitations *and* that the CDCR understood what those limitations were.

We also do not agree that because Dr. Wells's report was eight years old, it imposed on the CDCR no duty to accommodate. The CDCR suggests that because eight years had elapsed between Dr. Wells's report and plaintiff's reassignment in 2008, it was reasonable for the prison to seek updated information on whether there was a continued need for accommodation. We agree. The relevant question on appeal, however, is not whether it was reasonable for the CDCR to seek updated information, but rather whether it was reasonable to refuse to accommodate plaintiff until she submitted such updated information—and, more specifically, whether in the absence of updated information, the CDCR had a duty to accommodate plaintiff in August, September, October, and November 2008.

Substantial evidence supported the trial court's conclusion that the CDCR had a duty to accommodate plaintiff between August and November 2008. First, as the trial

27

court correctly noted, Dr. Wells's report gave no suggestion that the need for accommodation would disappear over time, and there was no time limit placed on the accommodation ordered by the associate warden in 2000. Thus, while it was not unreasonable for the CDCR to seek updated medical information, it *was* unreasonable to refuse to accommodate plaintiff for some reasonable period while she obtained that information.

Substantial evidence also supported the trial court's implicit conclusion that plaintiff's failure to obtain updated medical information between August and November 2008 was not unreasonable and did not cause the breakdown in the interactive process. Plaintiff was not being treated for her psychiatric disability when she was assigned to the bridging program in August 2008, and she therefore did not have a relationship with a doctor from whom she readily could have sought an opinion about the necessity of work restrictions/accommodations. Moreover, in connection with plaintiff's pending workers' compensation claim, an agreed medical examination had been scheduled with Dr. Bruce Rubenstein for October 6, 2008. In view of that scheduled appointment, it was reasonable for plaintiff to rely on the report she expected would be generated after that exam to verify her continuing need for accommodation. In view of these facts, although it was not unreasonable for the CDCR to ask plaintiff to obtain updated medical verification in August 2008, substantial evidence supported the trial court's conclusion that the CDCR was required to honor plaintiff's existing accommodation while she attempted to obtain that updated verification.

2. The Interactive Process Prior to the Second Failure to Accommodate (April 2009)

As discussed, the second failure to accommodate occurred between March and April 2009. In late March 2009, plaintiff was told that she would be transferred back to the bridging program effective April 1. Plaintiff was concerned that she again would be asked to test and tutor inmates in classrooms without direct outside access, and so she immediately submitted a new request for accommodation. Plaintiff initially was

28

accommodated with an office and classrooms with windows and direct outside access, but on April 21 and 23, she was directed to facilitate inmates in the secured housing area of C yard. When she refused to do so, she was disciplined.

The CDCR contends that because plaintiff still had not submitted updated medical verification, substantial evidence did not support the trial court's conclusion that it was required to accommodate plaintiff in April 2009. We disagree. On April 1, 2009, approximately a week after plaintiff submitted an updated request for accommodation, plaintiff met with Castillo and Barrie Hafler, who said plaintiff would be required to submit updated medical information, and asked for permission to contact plaintiff's doctors. Plaintiff denied Castillo permission to contact Dr. McGrath, but she agreed to allow Castillo to contact Dr. Murphy, the psychologist who had signed the work limitation request in 1997.[11] Castillo apparently did not attempt to contact Dr. Murphy until May 5, 2009, and she did not tell plaintiff until June 19 that Dr. Murphy had not responded. Accordingly, as of April 21 and 23, it was reasonable for plaintiff to believe that Dr. Murphy would provide the updated medical verification the CDCR had requested. Plaintiff's failure to seek additional medical verification at that time therefore did not cause a breakdown in the interactive process. In view of these facts, substantial evidence supported the trial court's conclusion that plaintiff was not responsible for a breakdown in the interactive process prior to April 2009, and thus that the CDCR's failure to accommodate constituted a violation of section 12940, subdivisions (m) and (n).

---

[11]     Plaintiff said she did not want Castillo to contact Dr. McGrath because Dr. McGrath was her personal physician and she "[didn't] want [Castillo] in my personal medical life." On May 22, 2009, Castillo sent Dr. Murphy a letter requesting her medical opinion as to plaintiff's ability to work in the prison environment in classrooms that did not have direct outside access, but Dr. Murphy apparently did not respond.

29

## II.     The Permanent Injunction Is Overly Broad

The judgment included a permanent injunction enjoining the CDCR "from (1) transferring, demoting, or reassigning Plaintiff TERRI SWITZER from her position as Academic Teacher at CDCR's Los Angeles County Prison, Lancaster (the 'Prison'); (2) transferring or reassigning Plaintiff TERRI SWITZER from a classroom in the Vocational area, Yard C, of the Prison, where she is currently assigned, to any of the Program Buildings of the Prison or, based on a demonstrated security need, to any room to perform her duties as Academic Teacher that does not provide immediate egress to the outside of the room and/or the building, without depending on a correctional officer or other person to unlock the door; (3) requiring that Plaintiff TERRI SWITZER conduct testing, attend training, enter or attend any meeting, deliver materials, or otherwise perform any duties in any area of the Prison where she does not have immediate egress (i.e., where she cannot immediately leave without depending on a correctional officer or other third party to unlock the door); (4) requiring that Plaintiff TERRI SWITZER conduct testing, attend training, enter or attend any meeting, deliver materials, tutor inmates, or otherwise perform any duties in any area of inmate housing; (5) doing anything to deprive Plaintiff TERRI SWITZER of adequate security, materials, furniture, or other necessary items required to perform her duties as an Academic Teacher."

The CDCR contends that the trial court abused its discretion by entering the injunction because no evidence was presented that the CDCR has failed to accommodate plaintiff since April 2009 or that it is likely to do so in the future, and the CDCR cannot be enjoined from making personnel decisions and managing its employees. We conclude that the trial court acted well within its discretion in granting a permanent injunction, but that the injunction it entered was overly broad.

### A.     *Legal Standards*

"'A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate.' (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646.) The

grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion. (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.) The exercise of discretion must be supported by the evidence and, 'to the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts, [we] review such factual findings under a substantial evidence standard.' (*Ibid.*) We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order. (*Cabrini Villas Homeowners Assn. v. Haghverdian* (2003) 111 Cal.App.4th 683, 688-689.)" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390.)

> B.     *The Trial Court Had Discretion to Enter a Permanent Injunction, But the Injunction It Entered Is Overly Broad*

The CDCR contends that the trial court abused its discretion by entering a permanent injunction because no evidence was presented that the CDCR has failed to accommodate plaintiff since April 2009 or that it is likely to do so in the future. We do not agree. Our Supreme Court has described the court's power to enjoin conduct violative of FEHA as follows: "It is beyond question that, in general, both the Department of Fair Employment and Housing and courts enforcing the FEHA are empowered not only to redress past instances of employment discrimination, but to prevent a recurrence of such misconduct. Section 12920 states that the purpose of the FEHA is 'to provide effective remedies which will eliminate' employment discrimination. Section 12920.5 adds: 'In order to eliminate discrimination, it is necessary to provide effective remedies that will both prevent and deter unlawful employment practices and redress the adverse effects of those practices on aggrieved persons.' . . . [C]ourts can, and often do, issue injunctions prohibiting the recurrence or continuation of employment discrimination. We have held 'that, in a civil action under the FEHA, all relief generally available in noncontractual actions . . . may be obtained.'

31

(*Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 221.) *This includes injunctive relief.* (*Snipes v. City of Bakersfield* (1983) 145 Cal.App.3d 861, 869-870.)" (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 131-132 (*Aguilar*), italics added.)

Injunctive relief is not unnecessary merely because a defendant has ceased its unlawful conduct during the pendency of legal proceedings. "'[M]any courts have rejected arguments against injunctive relief where defendants changed their practices only in response to being sued.' (2 Lindemann, Employment Discrimination Law (3d ed. 1996) ch. 40, p. 1748, fn. omitted.) 'Generally, a person subjected to employment discrimination is entitled to an injunction against future discrimination [citation], unless the employer proves it is unlikely to repeat the practice [citations]. . . . An employer that takes curative actions only after it has been sued fails to provide sufficient assurances that it will not repeat the violation to justify denying an injunction.' (*E.E.O.C. v. Goodyear Aerospace Corp.* (9th Cir. 1989) 813 F.2d 1539, 1544; *EEOC v. Frank's Nursery & Crafts, Inc.* (6th Cir. 1999) 177 F.3d 448, 467-468 ['upon a finding of any intentional employment discrimination, a district court possesses broad discretion to craft an injunction that will ensure the employer's compliance with the law']; *Dombeck v. Milwaukee Valve Co.* (7th Cir. 1994) 40 F.3d 230, 238 [injunction proper although harasser and victim had been reassigned to different work areas]; *U.S. E.E.O.C. v. Gurnee Inn Corp.* (7th Cir. 1990) 914 F.2d 815, 817 [injunction prohibiting future sexual harassment proper although the employment of the sole harasser had been terminated]; cf. *Marin County Bd. of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920, 929 ['"[T]he voluntary discontinuance of alleged illegal practices does not remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges where by the mere volition of a party the challenged practices may be resumed." [Citation.]'].)" (*Aguilar, supra*, 21 Cal.4th at p. 133.)

In the present case, although the CDCR accommodated plaintiff during the pendency of this litigation, it has never recognized her need for or right to an

32

accommodation. Indeed, the trial court found that "Ms. Switzer's March 26, 2009, request for reasonable accommodation had not been resolved by the time Mr. Bloch shut down the process in September 2011"—a delay that the trial court found "defies belief." Under these circumstances, an injunction requiring the CDCR to accommodate plaintiff as required by the FEHA was well within the trial court's discretion.

However, although the trial court had discretion to enjoin future unlawful conduct, the injunction it entered was overly broad. The first provision of the injunction enjoins the CDCR from "transferring, demoting, or reassigning Plaintiff TERRI SWITZER from her position as Academic Teacher at CDCR's Los Angeles County Prison, Lancaster (the 'Prison')." We agree with the CDCR that this provision unduly limits the department's ability to discipline or reassign plaintiff in accordance with future need—indeed, it essentially grants plaintiff permanent employment regardless of any future misconduct on her part or any changes within the correctional system. For example, should plaintiff fail to maintain her teaching credential or to show up for work, the injunction prohibits reassignment or discipline. Similarly, the injunction prohibits reassignment should the state eliminate academic teacher positions entirely or close the Lancaster prison.

The second provision of the injunction is equally problematic. It enjoins the CDCR from "transferring or reassigning Plaintiff TERRI SWITZER from a classroom in the Vocational area, Yard C, of the Prison, where she is currently assigned, to any of the Program Buildings of the Prison or, based on a demonstrated security need, to any room to perform her duties as Academic Teacher that does not provide immediate egress to the outside of the room and/or the building, without depending on a correctional officer or other person to unlock the door." Although this limitation is appropriate under current circumstances, we can imagine future events—for example, the closure of all or parts of the Lancaster Prison—that could make honoring the injunction impossible or impractical.

As we have said, section 12940, subdivision (m) requires an employer to make "reasonable accommodation" for an employee's known physical or mental disability only

33

if doing so will not produce "undue hardship"—i.e., significant difficulty or expense when considered in light of a variety of factors.[12]  (§§ 12940, subd. (m), 12926, subd. (u).)  Because the present injunction does not permit the CDCR to balance plaintiff's need for an accommodation against the difficulty or expense of providing such accommodation in the case of future changes to the prison's physical structure, inmate population, or legal mandate, it exceeds the scope of the trial court's discretion under the FEHA.

The present case is analogous to *Sturgill v. UPS* (8th Cir. Ark. 2008) 512 F.3d 1024 (*Sturgill*).  There, the plaintiff, a full-time driver for the United Parcel Service (UPS), was terminated when he refused to complete his route on a particular day because working past sundown on a Friday violated his beliefs as a member of the Seventh Day Adventist Church.  He sued UPS for religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 United States Code section 2000e-2(a)(1).  After a lengthy trial, a jury found that UPS violated Title VII by failing to reasonably accommodate plaintiff's religious observance, and the district court awarded plaintiff reinstatement, front pay, compensatory damages, and an injunction requiring UPS "'to accommodate [plaintiff's] religious observation of the Sabbath in the future.'"  (*Id.* at p. 1027.)

The Eighth Circuit affirmed the award of compensatory damages, reinstatement, and front pay, but reversed the grant of "overly-broad" injunctive relief.  (*Sturgill*, *supra*, 512 F.3d at p. 1027.)  It noted that a "reasonable" accommodation need not eliminate *all*

---

[12]  The factors are:  "(1) The nature and cost of the accommodation needed.  [¶] (2) The overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility.  [¶]  (3) The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities.  [¶]  (4) The type of operations, including the composition, structure, and functions of the workforce of the entity.  [¶]  (5) The geographic separateness or administrative or fiscal relationship of the facility or facilities."  (§ 12926, subd. (u).)

religion-work conflict: "To be sure, there may be many situations in which the only reasonable accommodation is to eliminate the religious conflict altogether. But in close cases, that is a question for the jury because it turns on fact-intensive issues such as work demands, the strength and nature of the employee's religious conviction, the terms of an applicable [collective bargaining agreement], and the contractual rights and workplace attitudes of co-workers. Bilateral cooperation under Title VII requires employers to make serious efforts to accommodate a conflict between work demands and an employee's sincere religious beliefs. But it also requires accommodation by the employee, and a reasonable jury may find in many circumstances that the employee must either compromise a religious observance or practice, or accept a less desirable job or less favorable working conditions." (*Id.* at p. 1033.) Accordingly, the court vacated the injunction, noting that it was "'overbroad'" and "it is not at all clear what accommodations will be reasonable in the future." (*Id.* at p. 1035.)

As in *Sturgill*, the injunction in the present case was overly broad because it required accommodation of plaintiff's work limitations without consideration of undue hardship in light of possible future institutional changes. We therefore reverse it and remand to the trial court for entry of a new and different injunction that complies with the dictates of section 12940, subdivision (m). Specifically, the injunction should grant a permanent accommodation consistent with the recommendations of Dr. Reading, so long as such accommodations can be granted without undue hardship within the meaning of section 12940, subdivision (m).

### III.    The Attorney Fee Award

Following trial, plaintiff sought attorney fees pursuant to section 12965, subdivision (b) as follows: a lodestar award of $166,421 to the Law Offices of Richard A. Stavin, and a lodestar award of $452,834 to the Excelus Law Group, Inc., both enhanced by a multiplier "within the court's discretion of between 1.4 and 2.0 times the lodestar request." The trial court denied the request for a multiplier, and awarded Stavin fees of $151,600 and Excelus fees of $428,000, for a total of $579,600.

35

Notably, the CDCR does not contend on appeal that the trial court was without power to award attorney fees or that the fees awarded were excessive. Instead, it urges that we should reverse the award because the trial court "did not show how the . . . attorneys' fees award was calculated," and it suggests that "[w]hen the record is unclear as to whether the award of attorneys' fees is consistent with the applicable legal principles, the award may be reversed and remanded to the trial court for further consideration and amplification of its reasoning."

The court rejected a similar contention in *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1250 (*Taylor*). While the court noted that the trial court "would have facilitated appellate review if it had specified the factors it had considered in [awarding attorney fees]," it held that the failure to do so did not compel a reversal. The court explained: "'In reviewing a challenged award of attorney fees and costs, we presume that the trial court considered all appropriate factors in selecting a multiplier and applying it to the lodestar figure. [Citation.] This is in keeping with the overall review standard of abuse of discretion, which is found only where no reasonable basis for the court's action can be shown. [Citation.]' (*Ramos v. Countrywide Home Loans, Inc*. (2000) 82 Cal.App.4th 615, 621; accord, *Downey Cares v. Downey Community Development Com*. (1987) 196 Cal.App.3d 983, 998.)

"The following excerpt from *Gorman v. Tassajara Development Corp*. (2009) 178 Cal.App.4th 44, 67, is instructive: 'We find no California case law . . . requiring trial courts to explain their decisions on all motions for attorney fees and costs, or even requiring an express acknowledgment of the lodestar amount. The absence of an explanation of a ruling may make it more difficult for an appellate court to uphold it as reasonable, but we will not presume error based on such an omission. . . . "'"All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown."' (*Denham v. Superior Court* [(1970)] 2 Cal.3d 557, 564 . . . .)" In the absence of evidence to the contrary, we presume that the trial court considered the relevant factors. [Citation.]'" (*Taylor*, *supra*, 222 Cal.App.4th at pp. 1249-1250.)

*Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1308, on which the CDCR relies for the proposition that an attorney fee award may be reversed for abuse of discretion if the record does not show how the trial court calculated the award of fees, does not support it. *Harman* considered an award of fees under the federal Civil Rights Attorney's Fees Awards Act of 1976, 42 United States Code section 1988. (*Id*. at pp. 1306-1307.) *Harman* noted that while California courts do not require statements of decision with regard to fee awards, federal law is different, requiring the lower court "'to provide a concise but clear explanation of its reasons for the fee award.'" (*Id*. at p. 1308.) The court concluded that "in reviewing a federal remedy, it is reasonable to insist on a record adequate to allow a meaningful review of federal standards governing the remedy." (*Ibid*.) The holding has no application to the present case, where plaintiff's claims were brought under state, not federal, law.[13]

Because California law does not require trial courts to show how attorney fee awards are calculated, the trial court's failure to do so here was not an abuse of discretion.

---

[13]  *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140 also does not assist the CDCR. There, the trial court abused its discretion in awarding attorney fees because its order suggested that it "arbitrarily relied upon what it considered to be a reasonable rate for generic expert attorney testimony fixed by [Imperial County Superior Court] local rule 3.12," rather than "the prevailing rate in the community for *comparable* professional legal services." (*Id*. at p. 156.)

## DISPOSITION

We affirm the grant of judgment and award of attorney fees to plaintiff. We reverse the permanent injunction and remand the matter to the trial court for further proceedings consistent with this opinion. Costs are awarded to plaintiff.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.[*]

We concur:

EPSTEIN, P. J.

WILLHITE, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.